# UNITED STATES DISTRICT COURT

# DISTRICT OF MARYLAND

| | |
|---|---|
| MALIBU MEDIA, LLC, <br>　　　　　　Plaintiff, <br>　　v. <br>JOHN DOE subscriber assigned IP address <br>173.64.119.92, <br>　　　　　　Defendant. | Case No. 1:14-cv-0223-MJG <br><br> Assigned to:  Honorable Marvin J. Garbis <br>　　　　　　　　United States District Judge |
| MALIBU MEDIA, LLC, <br>　　　　　　Plaintiff, <br>　　v. <br>JOHN DOE subscriber assigned IP address <br>71.200.143.209, <br>　　　　　　Defendant. | Case No. 1:14-cv-0257-CCB <br><br> Assigned to:  Honorable Catherine C. Blake <br>　　　　　　　　United States District Judge |
| MALIBU MEDIA, LLC, <br>　　　　　　Plaintiff, <br>　　v. <br>JOHN DOE subscriber assigned IP address <br>76.100.228.15 <br>　　　　　　Defendant. | Case No. 1:14-cv-0263-RDB[1] <br><br> Assigned to:  Honorable Richard D. Bennett <br>　　　　　　　　United States District Judge |

## ISP SUBSCRIBER'S MOTION FOR AN ORDER TO SHOW CAUSE
## AS TO WHY ALL EVIDENCE AND DATA FROM TOBIAS FIESER
## AND HIS COMPANY IPP SHOULD NOT BE PRECLUDED
## AND THESE CASES DISMISSED

---

[1] An identical version of this motion is being filed concurrently in all cases identified on the caption.  In addition, courtesy copies of these papers are being provided to Judges Titus, Grimm and Motz, due to the issues raised with respect to potential consolidation.

## <u>NOTICE OF MOTION</u>

Comes now the Internet user who pays the bill for the account associated with the IP address listed on the caption of this case, who plaintiff Malibu Media, LLC ("**Malibu**") accuses of being the John Doe defendant in this action, ("**Movant**"), by and through counsel, to move the Court, for an order to show cause as to why all evidence and data collected by key witness Tobias Fieser and his company IPP should not be excluded and these cases dismissed, on the ground that Fieser and IPP are or were being paid on a contingent fee basis.  *See Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300 (4th Cir. 2002); *Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001) *aff'd on other grounds*, 43 Fed. Appx. 547, 551 (4th Cir. 2002).

This motion is being filed concurrently with Movant's motion to (1) intervene anonymously, (2) consolidate Malibu Media cases; and (3) temporarily stay outstanding subpoenas (the "**Procedural Motion**").

## TABLE OF CONTENTS TO MEMORANDUM IN SUPPORT

TABLE OF CONTENTS TO MEMORANDUM IN SUPPORT ................................................. 3

TABLE OF AUTHORITIES ................................................................................................ 5

I. INTRODUCTION AND SUMMARY ............................................................................. 9

II. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND .................................... 16

    (a)  Malibu's Verified Discovery Responses Establish That It Pays Or Paid Its Key Witness, IPP, Pursuant To An "Oral Contingency Fee" Agreement ........................................... 16

    (b)  IPP, the *De Facto* Expert, Is A Front for A Discredited German Firm Called Guardaley .... 17

    (c)  The Complaint Is Founded Upon Tobias Fieser's Supposed Technical Observations .......... 19

    (d)  What Happened In The Case Before Judge Motz: Plaintiff Filed Notice Of Voluntary Dismissal To Avoid Judicial Scrutiny Of Contingent Fee Witness ...................................... 20

III. MALIBU SHOULD BE ORDERED TO SHOW CAUSE AS TO WHY ALL EVIDENCE AND DATA FROM TOBIAS FIESER AND HIS COMPANY IPP SHOULD NOT BE EXCLUDED AND THESE CASES DISMISSED ................................................................................................ 23

    (a)  Preclusion Of Evidence From Contingent Fee Witnesses Is Supported By Binding Fourth Circuit Precedent, Myriad Cases From Other Jurisdictions, Sound Public Policy, Common Law Principles, Rule Of Professional Conduct 3.4, And The Federal Anti-Gratuity Statute 24

        (1)  For Reasons Of Public Policy, The Fourth Circuit Affirmed Dismissal In *Accrued Financial*, Which Involved An Auditing Company Setup To "Mine" For Lawsuits 24

        (2)  *Farmer* And Cases From Other Jurisdictions Confirm That District Courts Must Strike Evidence From Contingent Fee Experts ........................................................ 28

        (3)  Maryland Rule Of Professional Conduct 3.4 And The Federal Anti-Gratuity Statute Also Support Preclusion And Dismissal ...................................................... 31

        (4)  Court's Sanction Authority And Supervisory Power Are Also Tools That May Be Invoked To Remedy A Contingent Fee Witness Situation ...................................... 32

    (b)  Malibu's Arrangement With IPP Violates The Fourth Circuit's Rule From *Accrued Financial* That An Investigative Company Cannot Have A Contingent Fee Interest In Litigation It Is In The Business Of Stirring Up ......................................................... 35

/ /

(c)  Additional Facts Supporting Exclusion And Dismissal: Central Importance Of IPP's Evidence, Suspect Nature Of The "Oral Contingency Agreement," Malibu's Repeated Avoidance Of Discovery And Lack Of Candor ....................................................... 37

    (1)  Multiple Facts Suggest "Wrongdoer's Culpability": The Concerted Effort To Avoid A Paper Trail, Dismissing The 3024 Action, Omission Of Adverse Facts In The *Ex Parte*, The Statements Denying IPP's Links To Guardaley ...................................... 38

        (A)  The Very Existence Of An "Oral Contingency Agreement" With A Witness Is Inherently Suspicious ................................................................ 38

        (B)  Malibu's Dismissal Of The 3024 Action And Attempt To Avoid Scrutiny Of IPP "Indicates An Improper Purpose For The[se] Suits" ................... 39

        (C)  Malibu Omitted Adverse Facts When It Moved <u>Ex Parte</u> For Early Discovery, In Violation Of The Rules Of Professional Conduct ............. 40

        (D)  IPP Is Really A Front For The Discredited, Unreliable German Firm Called Guardaley, And Someone Appears To Have Affirmatively Misled Judges Titus And Grimm On This Issue ................................................... 41

    (2)  Fieser's Technical Observations Constitute The Key Factual Predicate For The Entire Complaint, Meaning That The Contingent Fee Arrangement Here Is Highly Prejudicial Both To Movant And To The Judicial Process ........................................ 43

    (3)  The Public Interest, Lack Of Other Effective Sanctions, And Unusual Role Of The "Client" Also All Militate In Favor Of Dismissal .................................................... 44

        (A)  On Balance, These Lawsuits Are Against The Public Interest ................. 44

        (B)  No Sanction Short Of Dismissal Would Do Justice Or Serve As An Effective Deterrent .................................................................................... 47

        (C)  The Unusual Array Of Real Parties In Interest Behind These Suits Also Militates In Favor Of Dismissal ............................................................... 50

(d)  The Response Malibu Has Made So Far In Other Districts On The Contingent Fee Witness Problem Suggests Still More Obfuscation ................................................................ 52

    (1)  Apparently, Fieser's Sworn Assertion Here, That He Used IPP's "IPTRACKER" Software To Collect The Data Underlying This Lawsuit, Was False ...................... 52

    (2)  Malibu's Assertion The "Proprietary" System Used To Log IP Addresses Is "Not Capable Of Being Manipulated" Is Facially Ridiculous .......................................... 55

IV. CONCLUSION .......................................................................................................................... 56

## **TABLE OF AUTHORITIES**

**Cases**

*Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 2000 WL 976800,

(D. Md. No. 1:99-cv-2573, ECF No. 20, 6/19/00) ("*Accrued Financial I*") ................................ passim

*Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*,

298 F.3d 291, 300 (4th Cir. 2002)  ("Accrued Financial II") ........................................ passim

*AF Holdings, LLC v. John Doe*, C.D. Cal. Case No. 2:12-cv-5712-ODW..................................... 45

*Caldwell v. Cablevision Sys. Corp.*, 984 N.E.2d 909, 912, 960 N.Y.S.2d 711 (N.Y. 2013) .................... 29

*Centennial Mgmt. Servs. v. Axa Re Vie*, 193 F.R.D. 671, 681 (D. Kan. 2000)......................................... 31

*Chambers v. Nasco*, 501 U.S. 32 (1991)............................................................................. 32

*City & Cnty. of Denver v. Board of Assessment Appeals*, 947 P.2d 1373, 1379 (Colo. 1997)................ 29

*Commonwealth v. Miranda*, 458 Mass. 100, 934 N.E.2d 222, 229 n.15 (Mass. 2010)........................... 29

*Communist Party v. Subversive Activities Control Board*, 351 U.S. 115, 124 (1956) ( ................... passim

*Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 390 (1990)........................................................ 9

*Cosgrove v. Sears Roebuck and Co.*, 1987 WL 33595 (S.D.N.Y. Dec.21, 1987) ............................. 28, 29

*Dixon v. District of Columbia*, 394 F.2d 966 (D.C. Cir. 1968) ......................................... 33, 50

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir.  2009)....... passim

*Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001) .......................................... passim

*Followwill v. Merit Energy Co.*, 2005 WL 5988695, at *1 (D. Wyo. Apr. 11, 2005)............................. 29

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n,*

865 F. Supp. 1516, 1526 (S.D. Fla. 1994) ......................................................... 29

*Hamilton v. General Motors Corp.*, 490 F.2d 223, 228-229 (7th Cir. 1973) .......................................... 29

*Hines v. KFC United States Props.*, 2010 U.S. Dist. LEXIS 13051 (S.D. Cal. Feb. 16, 2010) .............. 14

*In re BitTorrent Adult Film Copyright Infringement Cases*, 2012 U.S. Dist. LEXIS 61447,

2012 WL 1570765 (E.D.N.Y. May 1, 2012) (E.D.N.Y. No. 11-3995)................................. 49

*In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 69 (N.D. Ill. Bankr. 2002) ............................... 30

*In re Schapiro*, 128 N.Y.S. 852, 858 (N.Y. App. Div. 1911) ...................................... 29

*In re SMTC Mfg.*, 421 B.R. 251, 264 n.2 (W.D. Tex. Bankr. 2009) ............................ 29

*Ingenuity 13, LLC v. John Doe*, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal., May 6, 2013) .............. passim

*K-Beech, Inc. v. Does 1-85*, 2011 U.S. Dist. LEXIS 124581, 6-7 (E.D. Va. Oct. 5, 2011)..................... 39

*Malibu Media, LLC v. Benson*, D. Col. No. 1:13-cv-2394 ........................................ passim

*Malibu Media, LLC v. Bochnak*, N.D. Ill. No. 1:12-cv-7030 ...................................... 40

*Malibu Media, LLC v. Doe,* Case No. 3:13-cv-00209 ............................................ 44

*Malibu Media, LLC v. Hinds*, et al., Case No. 1:12-cv-01117 .................................... 40

*Malibu Media, LLC v. John Doe*, D. Md. No. 8:13-cv-03024-JFM .............................. 20

*Malibu Media, LLC v. John Doe*, D. Md. No. 8:14-cv-747-JFM ................................ 46

*Malibu Media, LLC v. John Doe*, N.D. Ill. No. 1:13-cv-6312, ECF No. 44, 2/21/14 ...................... passim

*Malibu Media, LLC v. John Does 1-5*, S.D.N.Y. No. 12-cv-2954 ................................ 52

*Mercantile Adjustment Bureau, L.L.C. v. Flood*, 278 P.3d 348, 354 (Colo. 2012) .................. 37

*Ojeda v. Sharp Cabriollo Hosp.,* 10 Cal. Rptr. 2d 230 (Ct. App. 1992).............................. 26

*Ouimet v. USAA Casualty Ins. Co.*, 2004 U.S. Dist. LEXIS 31199,

    2004 WL 5865274, at *2 (C.D. Cal. Jul. 14, 2004).......................................... 29

*Perez v. Z Frank Oldsmobile, Inc.*, 223 F.3d 617 (7th Cir. 2000) ................................ 50

*Reffett v. C. I. R.*, 39 T.C. 869, 878 (1963) .................................................. 29

*Straughter v. Raymond*, 2011 U.S. Dist. LEXIS 53195, at *9-10 (C.D. Cal. May 9, 2011) ............ passim

*Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1042 (7th Cir. 1988) .............................. 30

*Thiel v. Southern Pac. Co.*, 328 U.S. 217 (1946)............................................. 34

*Thomas v. Arn*, 474 U.S. 140, fn.5 (1985) .................................................. 34

*United States v. Levenite*, 277 F.3d 454, 462-463 (4th Cir. 2002) ............................ 31

*United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993.............................. passim

*United States v. Singleton*, 144 F.3d 1343, 1345 (10th Cir. 1998) ...................... 29, 31

*Von Kesler v. Baker*, 21 P.2d 1017 (Cal. Dist. Ct. App. 1933).................................. 26

*Westin Tucson Hotel Co. v. State*, 936 P.2d 183, 190 (Ariz. App. 1997) ................................................. 29

*White v. General Motors Corp., Inc.*, 908 F.2d 675, 680 (10th Cir. 1990) ............................................. 38

*Williamson v. United States*, 311 F.2d 441 (5th Cir. 1962) ........................................................ 33, 37, 50

*Zaczek v. Fauquier County, Va.*, 764 F. Supp. 1071, 1079 (E.D. Va. 1991).................................... passim

**Statutes**

18 U.S.C. § 201(c)(2).......................................................................................................................... 12, 37

28 U.S.C. § 1927 ....................................................................................................................................... 38

**Rules**

California Rules of Professional Conduct, Rule 5-310........................................................................... 29

Fed. R. Civ. P 11(b) and (c) .................................................................................................................. 32

Fed. R. Civ. P. 11(c)(4)..................................................................................................................... 32, 49

Fed. R. Civ. P. 12(b)(6)........................................................................................................................... 25

Fed. R. Civ. P. 24 .................................................................................................................................... 13

Fed. R. Civ. P. 37(b)(2)(A)(v) ................................................................................................................ 32

Fed. R. Civ. P. 41(a)(1)(A)(i).................................................................................................................. 22

Fed. R. Civ. P. 42(a)(1)........................................................................................................................... 14

Fed. R. Evid. 701(c) ................................................................................................................................ 16

Maryland Rules of Professional Conduct, Rule 3.3(d) ........................................................................... 41

Maryland Rules of Professional Conduct, Rule 3.4(b) ........................................................................... 11

Md. Rules 16-812, Rules of Professional Conduct 3.4 cmt. (2000) ....................................................... 28

## Other Authorities

Beale, "Reconsidering Supervisory Power in Criminal Cases: Constitutional and Statutory Limits on the Authority of the Federal Courts," 84 COLUM. L. REV. 1433, 1441 (1984)........................................... 40

Maria Pallante, "The Next Great Copyright Act," 36 COLUM. J. L & ARTS 315 (2013) ........................ 56

Matthew Sag, "Copyright Trolling, An Empirical  Study," (March 21, 2014). Iowa Law Review, Forthcoming. Link: http://ssrn.com/abstract=2404950 ................................................................. 53, 55

Max Radin, *Maintenance by Champerty,* 24 CAL. L. REV. 48 (1935-36)................................................ 32

Opderbeck, D., "Peer-to-Peer Networks, Technological Evolution, and Intellectual Property Reverse Private Attorney General Litigation," 20 BERKELEY TECH. L.J. 1685 (2005) ..................................... 53

Paul Bond, "Making Champerty Work: An Invitation To State Action" 150 U. PA. L. REV. 1297 (April, 2002) ................................................................................................................................................... 32

Report of The Register of Copyrights, "Copyright Small Claims," (September 2013)........................... 56

*Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 2000 WL 976800 at *3 n. 3, (D. Md. No. 1:99-cv-2573, ECF No. 20, 6/19/00 ("*Accrued Financial I*")........................................... 9

*Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300 (4th Cir. 2002)  ("Accrued Financial II") ................................................................. 9

# I.  INTRODUCTION AND SUMMARY[2]

> "What has been is what will be, and what has been done is what will be
> done, and there is nothing new under the sun." - Ecclesiastes 1:9

The history of so-called "copyright trolling"[3] by pornography settlement cartels is only a few years old, but it is already repeating itself.  About a year ago, in litigation that became somewhat infamous in the federal courts, plaintiff's lawyers associated with the Prenda Law Firm, who were engaged in essentially the same business as Malibu is here, were sanctioned by Judge Otis D. Wright, II. *Ingenuity 13, LLC v. John Doe*, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal., May 6, 2013) (Case No. 12-cv-8333, ECF No. 130) (assessing monetary sanctions and referring lawyers engaged in mass filing of pornographic infringement lawsuits for criminal prosecution after they pled the fifth rather than answer Court's questions about who was really behind the litigation).

In the Prenda case, when confronted with probing questions about mysterious offshore shell companies fronting the nationwide settlement mill, rather than provide answers to these questions, the Prenda lawyers attempted to "cut [their] losses and run out of court, using Rule 41 as an emergency exit."[4]  It appears that the same thing has now occurred in the Malibu cases in this district.  Malibu has unilaterally dismissed a case pending before Judge Motz,[5] rather than address troubling concerns about

---

[2] Section I of this brief, "Introduction And Summary," is identical to the brief in support of the concurrently-filed Procedural Motion.  The remainder of both briefs, however, is different.

[3] For a timely and empirically-supported discussion of this phenomenon, which includes the first workable definition of "copyright trolling," *see* Matthew Sag, "Copyright Trolling, An Empirical  Study," (March 21, 2014). Iowa Law Review, Forthcoming. Link: http://ssrn.com/abstract=2404950

[4] *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 390 (1990).

[5] *See Malibu Media, LLC v. John Doe*, D. Md. No. 8:13-cv-03024-JFM, ECF No. 16, 3/6/14 (Notice of Voluntary Dismissal).  The same defense counsel handled that case as this one.  Malibu's counsel in Maryland was notified that a motion would be brought in that case to exclude the testimony of Tobias Fieser and his company IPP.  Exhibit X at pp. 1–2.  More specifically, counsel was provided with a copy of a motion from Colorado (Exhibit X at pp. 6–10) which cited, at footnote 5, both *Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300 (4th

the fact that Malibu (or its lawyers) apparently pays the key witness in these cases pursuant to an "oral contingency agreement."  The difference is that with Prenda it was the plaintiff's lawyers themselves hiding behind the foreign shell companies to mask the fact that they were the real parties in interest. Here, by contrast, it is a disreputable German computer forensic firm that is attempting to cover its tracks with a maze of affiliates, and which is being paid on a contingent fee basis to provide the factual underpinnings for all of Malibu's lawsuits. It is now time for some answers, which Malibu clearly wishes to avoid, and for an appropriate reckoning.

In the last three years, Malibu has filed approximately 1,817 copyright infringement lawsuits nationwide, with 175 of those suits being filed in this district, at last count.  Pietz Decl. ¶ 4.  In every instance, these lawsuits are supported by evidence provided by the German firm IPP. *See, e.g.,* Complaint ¶¶ 18-28 (ECF No. 1); Exhibits A-B to Complaint (ECF No. 1-1 and 1-2); *see also* Declaration of Tobias Fieser in support of *ex parte* Motion for Leave to Take Discovery Prior to a Rule 26(f) Conference ("**Fieser Decl.**") (ECF No. 4-5).

However, what Malibu has ***not*** disclosed to this Court is that IPP is a financially interested party being paid on contingency.  Exhibit B,[6] Response No. 1.  Specifically, in all of Malibu's cases, here, as elsewhere, IPP supplied the data underpinning the case pursuant to an "oral contingency agreement" with Malibu's national counsel Keith Lipscomb, of the Miami-based law firm Lipscomb, Eisenberg & Baker, P.L.  *See id.*  Malibu's reliance upon IPP, a contingent-fee witness, is contrary to common law

---

Cir. 2002); and *Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001) *aff'd on other grounds*, 43 Fed. App'x 547 (4th Cir. 2002) (citing *Accrued Financial* and stating '"[a]s Chief Judge Motz of this Court observed, 'witness contingency fee agreements affirmatively violate the fundamental policy of Maryland and the United States.'" ). Malibu's counsel initially promised a "comprehensive response" on the contingent fee witness issue (Exhibit X at p. 3), which never came.  Instead, three days later, Malibu simply dismissed the case before Judge Motz per Fed. R. Civ. P. 41(a)(1)(A)(i).  Pietz Decl, ¶ 43.

[6] Unless otherwise noted, all Exhibit references are to the Pietz Decl.

principles, public policy, the ABA Model and Maryland Rules of Professional Conduct, Rule 3.4(b), as well as the Federal Anti-Gratuity Statute, 18 U.S.C. § 201(c)(2).

As Judge Motz once noted of the problem posed by deals to pay witnesses a contingent fee, "[f]inancial arrangements that provide incentives for the falsification and exaggeration of testimony threaten the very integrity of the judicial process which depends upon the truthfulness of witnesses." *Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 2000 WL 976800 at *3 n. 3, (D. Md. No. 1:99-cv-2573, ECF No. 20, 6/19/00) (Motz, J.) *aff'd by* 298 F.3d 291, 300 (4th Cir. 2002) ("[w]e thus agree with the district court that, whether under the label of maintenance, champerty or barratry, the Assignments in this case violate Maryland's strong public policy against the stirring up litigation or promoting litigation for the benefit of the promoter rather than for the benefit of the litigant or the public."); *see also Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001) (granting motion to strike reports of expert retained under contingency fee arrangement and noting "[a]s Chief Judge Motz of this Court observed, 'witness contingency fee agreements affirmatively violate the fundamental policy of Maryland and the United States.'"), *aff'd on other grounds*, 43 Fed. Appx. 547, 551 (4th Cir. 2002); *citing Accrued Fin. Servs.*, 2000 WL 976800 at *3 n. 3.

Beyond the *potential* for impropriety and the affront to the integrity of the judicial system as a whole posed by Malibu paying its key witness on contingency, there are other serious reasons to doubt the technical reliability and honesty of IPP and the people behind it. *See* Declaration of Morgan Pietz re: IPP, Guardaley, and the "Oral Contingency Agreement" Malibu Media, LLC Had With Its Expert ("**Pietz Decl.**").

Notably, IPP itself is nothing more than a shell company designed to hide the fact that the technology supposedly relied upon by plaintiff, and the people behind it, really come from a discredited

German company called Guardaley.  *See* Pietz Decl.  In a German case, the State Court of Berlin ruled against Guardaley and found that its opponents "have stated and made a credible showing," that the claim that Guardaley "provides unreliable investigative services, is true."  Pietz Decl., ¶ 24; Exhibit J, p. 11.  Further, when Guardaley was confronted with the glaring problem in its software, which caused an unknown number of unjustified cease and desist letter to be sent out, Guardaley's principals attempted to hide the problem from the lawyers who had engaged them.  Pietz Decl., ¶¶ 18–19.  What the German court case and the evidence adduced there shows is that Guardaley was essentially caught running a so-called honeypot,[7] "by means of a falsified bit field" in the software, that was used to lure would-be infringers to try and download content monitored by Guardaley, so that those people could then be threatened with suit.  Pietz Decl., ¶ 26.

If the key witness being paid on a contingent fee basis for his testimony in this case was otherwise reputable, or if the contingent payment arrangement was an honest mistake made by litigants who did not know any better, perhaps the issue could be discounted.  Here though, just the opposite is true: Fieser and IPP are merely a front for Guardaley, a company that was caught once before engaging in impropriety, and whose methods were found by a German court to be unreliable.  And the "oral contingency agreement" here was apparently negotiated by Malibu's head national counsel, presumably so as to not leave a paper trail.  Exhibit C.

All of the documents submitted with the Pietz Decl., taken together, seem to suggest a plan of deception on the part of Guardaley, IPP and/or Malibu to hide the truth about IPP's direct, contingent interest in the outcome of these cases, and its links to Guardaley.  *See* Pietz Decl.  Judge Wright noted of Prenda,

---

[7] "A honey pot is a computer system on the Internet that is expressly set up to attract and 'trap' people who attempt to penetrate other people's computer systems."  http://searchsecurity.techtarget.com/definition/honey-pot

> "Plaintiffs' representations about their operations, relationships, and financial interests have varied from feigned ignorance to misstatements to outright lies. But this deception was calculated so that the Court would grant Plaintiffs' early-discovery requests, thereby allowing Plaintiffs to identify defendants and exact settlement proceeds from them. With these granted requests, Plaintiffs borrow the authority of the Court to pressure settlement." Ingenuity 13, *supra*, at p. 5.[8]

Later, in explaining why sanctions were justified, the Court noted that if the Prenda lawyers had

> "assigned the copyright to themselves, brought suit in their own names, and disclosed that they had the sole financial interest in the suit, a court would scrutinize their conduct from the outset. But by being less than forthcoming, they defrauded the Court." Ingenuity 13, *supra*, at p. 8.

Here, as to what appears to be "feigned ignorance to misstatements to outright lies," about IPP and Guardaley, compare Malibu's statements on the record in this district to Judges Titus and Grimm ("The German investigative company Guardaley has not reinvented itself as IPP, Ltd.," Exhibit S, p. 18) with the entire rest of the Pietz Decl.  Pietz Decl. ¶¶ 26–38, Exhibits L to V (detailing links between Guardaley and IPP).  Similarly, Mr. Fieser swore in a declaration filed here that he personally used IPP's software, running on IPP's servers, to collect the data that serves as the basis for this lawsuit.  *See* Fieser Decl., Exhibit A, ¶¶ 6, 8, 11, 12, 15. However, Malibu's new story, appears to be that it was actually Michael Patzer, who works for another German company called Excipio, who collected the data, using Excipio's software, on Excipio's servers.  *See* Exhibit Z, p. 8.

What to do about all this?

As a preliminary issue, to clear up the kind of objection Malibu was threatening to make as to Movant's standing to seek relief from this Court, Movant seeks to intervene in this action as of right, per Fed. R. Civ. P. 24.  Malibu's position, at least in the case before Judge Motz, was that ISP Subscribers like Movant who have not yet been served have no right to do anything in these cases other than have

---

[8] Page references to the *Ingenuity 13* case are to the PACER pagination.

their depositions taken.  Movant disagrees, but the easiest way to move past the issue is to formally intervene.

Another preliminary issue concerns who should hear and decide the issues raised here, and with what mandate?  These issues certainly apply to all of the Malibu cases in this district.  Accordingly, Movant seeks consolidation, per Fed. R. Civ. P. 42(a)(1), of all Malibu cases in this district as to the issues raised here.  Judges Titus and Grimm have already presided over a consolidated phase of Malibu litigation in this district, last year.  *See*, *e.g.*, *Malibu Media, LLC v. John Doe*, D. Md. No. 8:13-cv-0360-RWT, ECF Nos. 9, 31. Further, it must be noted that given Malibu's fairly transparent attempt to avoid Judge Motz's courtroom—for obvious reasons, in view of the cases cited above—transferring this issue back to his consideration would only be just desserts.  *Cf. Hines v. KFC United States Props.*, 2010 U.S. Dist. LEXIS 13051 (S.D. Cal. Feb. 16, 2010) (noting that dismissing one case so as to re-file another one for the same claims before a different court was a form of forum shopping).  In any event, Movant is pleased to proceed before any Judge of this Court, but does believe it would make sense for these issues to be adjudicated in consolidated fashion.

One final preliminary issue concerns what should happen with respect to ISP subpoenas that seek to identify Movant and any similarly situated litigants while the Court considers what to do about the contingent fee witness issue.  Movant therefore prays that the Court stay the return date on the outstanding subpoena seeking to identify Movant, and similarly order any further subpoena returns to be stayed in all related Malibu cases, and also refrain from issuing further authorizations for new subpoenas, pending adjudication of the Motion For An OSC and further order of the Court.  If the Court decides that these cases should not be dismissed, then discovery, including the ISP subpoena, could resume.  However, given that the authorization to issue the ISP subpoenas was predicated upon an *ex*

*parte* motion that did not appraise the Court of key adverse facts,[9] the returns on the subpoenas to the ISPs should be stayed until the Court can consider those facts.

The foregoing three issues, namely anonymous intervention, consolidation, and a temporary subpoena return stay order, have been combined into a single "Procedural Motion" analyzing all three issues. The "Motion For An OSC," filed concurrently, is briefed separately. The Court may wish to consider and decide the issues in the Procedural Motion before the Motion For An OSC on the merits.

As to the merits, given the current procedural posture, an order to show cause is the right way forward, so Malibu can put the relevant facts on the record before *this* Court. In particular, Malibu should be ordered to show cause on three factual issues and one resulting legal one, as follows: (1) confirm whether IPP and Fieser were engaged as contingent fee witnesses and detail the nature and extent of the relationship; (2) given the substantial documentary evidence suggesting otherwise, explain the statement made on the record to Judges Titus and Grimm denying that IPP is a front for Guardaley, and the apparent attempts to disguise Guardaley's behind-the-scenes role in these cases; (3) explain the conflicting statements about whether it was IPP or Excipio software used to collect the data this case is based on; and (4) assuming that IPP and Fieser do or did have a contingent interest in the outcome of this litigation and that IPP is really a front for Guardaley, and that Malibu has been less than forthright about all this, address what effect such champertous arrangements and lack of candor should have on this and other similarly situated cases, in view of Movant's arguments in the Motion For An OSC that preclusion and dismissal should result.

---

[9] ABA Model and Maryland Lawyer's Rules of Professional Conduct Rule 3.3(d): "In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse".

* * *

As noted, the Fourth Circuit has declared that "witness contingency fee agreements affirmatively violate the fundamental policy of Maryland and the United States."  Based on what appears to be true from the facts adduced so far, one can hardly imagine a scenario that would be a greater affront to such a policy than the Malibu Media litigation.

## II.  RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

**(a)**    **Malibu's Verified Discovery Responses Establish That It Pays Or Paid Its Key Witness, IPP, Pursuant To An "Oral Contingency Fee" Agreement**

IPP is a German-based company that provides services that involve the "track[ing] and monitor[ing of] illegal propagators within [BitTorrent] networks."[10]

Malibu's lawsuits are supported by evidence provided by IPP, and, in particular, IPP employee Tobias Fieser.[11] *See, e.g.,* Complaint ¶¶ 16-17, 19-20; Exhibits A-B; *see also* Fieser Decl., Exhibit A.  In an identical copyright infringement case in another jurisdiction, Malibu certified under penalty of perjury that IPP is paid based on a contingent share of settlement proceeds. Specifically, Malibu admitted the following:

> **"Interrogatory No. 1**: Please identify all . . . business entities that have an interest, financially, or otherwise, in this litigation, including, . . . forensic consultants, and/or witnesses, . . . and specifically and in detail describe the nature of the interest.

> **Response to Interrogatory No. 1**: . . . IPP International UG, is a fact witness who will testify that its technology detected that a person using Defendant's IP address was downloading and distributing Plaintiff's copyrighted works. ***Pursuant to an oral contingency fee agreement, IPP International UG is entitled to a small portion of the***

---

[10] *See* www.ippint.de/index.php?option=com_content&view=article&id=3&Itemid=3 (accessed Mar. 27, 2014).

[11] Malibu typically attempts to designate Fieser and IPP as fact witnesses, presumably to try and avoid the expense of preparing a written expert report in each case.  Movant doubts whether that is an appropriate designation, given the technological nature of the kind of facts (its all about IPP/Guardaley's proprietary logging software and IP addresses) that IPP is paid to supply as supposed evidence for Malibu.  *See* Fed. R. Evid. 701(c).

***proceeds from the resolution of this case in consideration for the services it provides***." <u>Exhibit B</u>, Response No. 1 (emphasis added).

In response to an interrogatory in another identical federal lawsuit in the Northern District of Illinois, Malibu admitted that "[it] and IPP International UG have an oral agreement that was formed approximately 2.5 years ago.  This agreement has not ever been modified or amended."  <u>Exhibit C</u>, Response No. 5.  According to Malibu, it, "first became aware of IPP International UG approximately 2.5 years ago through its attorneys, ***specifically, through communication with M. Keith Lipscomb***.  Plaintiff's attorneys negotiated the terms of Plaintiff's agreement with IPP International UG."  <u>Exhibit C</u>, Response No. 4 (emphasis added).

**(b)      IPP, the *De Facto* Expert, Is A Front for A Discredited German Firm Called Guardaley**

Guardaley is a computer forensic BitTorrent monitoring firm that does exactly what IPP does, but in Germany, and which is probably, at least, IPP's predecessor.  Facts explaining how Guardaley was discredited, and for what, are explained in detail in the accompanying Pietz Decl.  As relevant here, the summary of these facts is that: (1) in a German case, the State Court of Berlin ruled against Guardaley and found that its opponents "have stated and made a credible showing," that the claim that Guardaley "provides unreliable investigative services, is true."  Pietz Decl., ¶ 25; <u>Exhibit J</u>, p. 11.  (2) When confronted with the glaring problem in their software, which caused an unknown number of unjustified cease and desist letter to be sent out accusing people of copying when no copying had occurred, Guardaley attempted to hide the problem from the lawyers who had engaged them.  Pietz Decl., ¶¶ 20–22.  (3) What the German court case and the evidence adduced there shows is that Guardaley was essentially caught running a so-called honeypot, "by means of a falsified bit field" in the

software, that was used to lure would-be infringers to try and download content monitored by

Guardaley.  Pietz Decl., ¶ 17.

Further, there are quite a few documents, collected in the Pietz Decl., all suggesting that IPP is

really just a front for Guardaley.   To hit only some of the highlights:

- When Tobias Fieser submitted a document to a federal court explaining how what was supposed to be IPP's software works, he included a diagram suggesting that the monitoring is done via a "GL Observer" server, which is the trade name used by Guardaley in other cases for its own software monitoring suite.  Pietz Decl., ¶ 33; Exhibit Q.

- Recently, in a jobs advertisement posted in Germany, IPP sought to hire a "systemplanner," and the email address used to apply for the position was "jobs@guardaley.com."  Pietz Decl., ¶ 37, Exhibit T.

- A Mr. Daniel Arheidt has executed technical declarations on behalf of both IPP and Guardaley.  *Compare* Exhibit L (Arheidt Decl. for Guardaley) with Exhibit M (Arhedit Decl. for IPP).  In addition, Arheidt's declarations are essentially the same as the Fieser Decl. here (Exhibit A); as Patrick Achache's declaration from other cases for Guardaley (Exhibit O); and as Barry Logan's declaration from a Canadian case using Guardaley software (Exhibit R).

- A published report in *Wired* magazine suggests that Guardaley, through its main principal Patrick Achache, actively attempts to create shell companies for different ventures so as to conceal Guardaley's involvement in different jurisdictions.  Pietz Decl., ¶¶ 30, 33, Exhibit N.

- All of the people behind IPP, Guardaley, and most of Guardaley's various other shell companies appear to be physically located in Karlsruhe, Germany when they sign declarations (Pietz Decl., ¶ 32), notwithstanding IPP's use of a phony virtual office address in Hamburg on its website.  Pietz Decl., ¶ 32; Exhibits O, L, and P.

- Malibu has admitted in a court pleading filed in the District of Maryland that IPP and Guardaley "occasionally. . .work with each other, mainly because they are in the same common field and location."  Exhibit S, p. 17.

Notwithstanding the mounting evidence that IPP is really just Guardaley in disguise, Malibu has

sought to downplay any link, stating emphatically (if less then credibly) that "[t]he German investigative

- 18 -

company Guardaley has not reinvented itself as IPP, Ltd." *Malibu Media, LLC v. John Doe*, D. Md. No. 8:13-cv-360-RWT, ECF No. 15, 3/23/13, p. 18 (Exhibit S).  In the same letter to Judges Titus and Grimm, Malibu dismissed a suggestion that IPP was really just Guardaley by another name as "conspiracy theories" set forth by adverse counsel "with little evidence."  *Id.* at p. 17.

**(c)      The Complaint Is Founded Upon Tobias Fieser's Supposed Technical Observations**

The key charging allegations of the complaint—really, the factual support for Malibu's entire nationwide trolling enterprise—are the same in every lawsuit.  The gravamen of the complaint is that IPP supposedly observed and recorded a given IP address uploading and downloading small pieces of a file on the Internet at a given point in time and that the ones and zeroes supposedly exchanged with IPP's server somehow "correlate" to plaintiff's copyrighted movie.  ECF No. 1, Complaint, ¶¶ 18–28.  Without IPP's observations of the supposed copying, there really is no case.  If IPP's data is excluded, and Fieser is barred from testifying, there no plausible factual basis to support allegations (a) that any alleged infringement occurred; or (b) if it did, then who (meaning what IP address) did it.

The Fieser Decl. (Exhibit A), submitted in connection with plaintiff's motion for leave to issue the ISP subpoena (ECF No. 4), provides a bit more detail on Fieser and how his observations are the sole factual basis for this lawsuit.  In it, among other things, Fieser avers that, "I am employed by IPP International UG ("IPP"), a company organized and existing under the laws of Germany, in its litigation support department." Fieser Decl., ¶ 4.  He explains that he "used forensic software named INTERNATIONAL IPTRACKER v 1.5 and related technology enabling the scanning of the BitTorrent file distribution network for the presence of infringing transactions involving Plaintiff's movies. *Id.* ¶ 9.  He also swears that "I personally extracted the resulting data emanating from the investigation (*id.* ¶ 11)

- 19 -

and that he personally compared a control copy of Malibu's movies "side-by-side with the corresponding digital media file identified by its hash value as set forth on Exhibit A" (*id.* ¶ 16).[12]

Essentially, what the Fieser declaration explains is that the only reason Malibu believes that a John Doe defendant at a certain IP address downloaded a list of Malibu movies (as set forth in Exhibits A and B to the complaint), is because Fieser says so, based on his personal extraction of data using IPP's IPTRACKER software, and based on a visual inspection of each movie. *See* Fieser Decl.

**(d)     What Happened In The Case Before Judge Motz: Plaintiff Filed Notice Of Voluntary Dismissal To Avoid Judicial Scrutiny Of Contingent Fee Witness**

During February of 2014, particularly after reviewing a motion filed on the issue in Colorado,[13] Mr. Pietz who handles numerous Malibu cases, became aware that there was some kind of suggestion that Malibu was paying its key witness, Tobias Fieser, on a contingent fee basis.

On March 1, 2014, with reference to the aforementioned case before Judge Motz, *Malibu Media, LLC v. John Doe*, D. Md. No. 8:13-cv-03024-JFM (the "**3024 Action**"), Mr. Hoppe emailed Mr. Pietz, (who, together with Mr. Lowe as local counsel, was also representing the John Doe ISP subscriber in that case) stating "I am interested in taking the deposition of your client in this case as soon as possible. Would you please contact me as soon as possible to set up an appropriate date for doing so? If I do not hear from you shortly, I may have no other recourse than to act unilaterally on this issue. Thank you for your prompt attention to this matter." Exhibit W.

On March 3, 2014, Mr. Pietz called Mr. Hoppe to discuss his request to depose the John Doe ISP Subscriber in the 3024 Action. After noting that John Doe could be available the first week of April,

---

[12] With nearly 2,000 cases nationwide, multiplied by what is usually over a dozen movies per lawsuit, sometimes 30-40 movies listed in an Exhibit A to the complaint in a single case, one wonder how Mr. Fieser finds the time to "personally" extract the data and to "view" so many movies "side by side".

[13] *See Malibu Media, LLC v. Benson*, D. Col. No. 1:13-cv-2394, ECF No. 23, 2/20/14.

Mr. Pietz raised the issue as to what Mr. Hoppe had heard from his bosses about this contingent fee witness issue.  Mr. Hoppe professed ignorance, whereupon Mr. Pietz attempted to explain the situation. Mr. Pietz offered to move forward with Movant's deposition, but asked that Mr. Hoppe address in return the issue of contingent compensation being paid to IPP.  Mr. Pietz offered to enter into a protective order, which would cover disclosure of IPP's compensation information, and to stipulate to further extensions of the Rule 4(m) service of process deadline.  *See* Pietz Decl., ¶ 41; <u>Exhibit X</u>.

As subsequently summarized by Mr. Pietz in a follow-up email, Mr. Hoppe was not amenable to entertaining any kind of discussion or explaining, in any form, how IPP was compensated.  At the outset of the email, in the part regarding deposing John Doe, Mr. Pietz noted "**If necessary, I will stipulate to extend the discovery deadline**."[14] <u>Exhibit X</u>.

Crucially, in the follow-up email sent to Mr. Hoppe on March 3, 2014, Mr. Pietz attached for Mr. Hoppe's reference a copy of the Colorado motion to exclude Fieser's testimony, referenced above. (<u>Exhibit X</u>, pp. 6–10).[15] Although the Colorado motion sent to Mr. Hoppe mainly cites Colorado law, there is a string cite to law from other jurisdictions, which does mention two Maryland cases right on point.  *Id.* at pp. 9–10, fn.3.  Specifically, footnote 3 to the Colorado motion sent to Mr. Hoppe cites to *Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001) (case contains this quote, "As Chief Judge Motz of this Court observed [in *Accrued Fin. Servs.*], 'witness contingency fee agreements affirmatively violate the fundamental policy of Maryland and the United States.'") and *Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 300 (4th Cir. 2002).

---

[14] Mr. Pietz counsel wrote "discovery" in the email recap, but really meant Rule 4(m) deadline as well, which is was what was said on the phone.  Pietz Decl., ¶ 41.

[15] The document was originally filed in Colorado at *Malibu Media, LLC v. Benson*, D. Col. No. 1:13-cv-2394, ECF No. 23, 2/20/14.

Mr. Hoppe responded by email later that same day, March 3rd, writing,  "As to the entirely separate 'issue' of the compensation of IPP, ***I will have a comprehensive response for you shortly***." After decrying the "theft" of his client's pornography on a "grand scale," Mr. Hoppe then went on to note that Mr. Pietz's "attempt to prevent that rightful compensation through clever argument and procedural manipulation is both professionally and morally reprehensible." Mr. Hoppe then threatened Mr. Pietz with a Rule 11 motion and added that "Under no circumstances will we consider the idea of making preliminary discovery in these cases a two-way street. It was not designed that way by the Court and for good reason."  Exhibit X, pp. 3–4.

Mr. Pietz replied again that same day, March 3rd, saying, in full, "Thanks, Jon.  Please send me something under oath, which details the full history of IPP and Fieser's compensation arrangements, and explains the 'oral contingency agreement' discovery response, and I will consider holding off on a motion.  In terms of the kind of substantive answer which I consider insufficient, see Mr. Kotzker's[16] email attached as Exhibit C to the [Colorado] motion I sent you." Exhibit X, p 5.

Mr. Hoppe's promised "comprehensive response" on the issue of IPP's contingency compensation never came.  Instead, unprompted, and without any further communication beyond the above, the 3024 Action was voluntarily dismissed without prejudice by the plaintiff, unilaterally, per Fed. R. Civ. P. 41(a)(1)(A)(i) late on March 6, 2014.  3024 Action, ECF No. 16.  Presumably, by that point, a few days after the Colorado motion was sent over for his review, Mr. Hoppe (or one of his superiors), had looked at the Maryland law cited in the Colorado motion and determined that having the contingent fee witness issue heard before Judge Motz might not augur well for Malibu.  Shortly after filing his notice of dismissal, Mr. Hoppe emailed Mr. Pietz the following:

---

[16] Mr. Kotzker is Malibu's lawyer in Colorado, who has similarly refused to divulge any details as to the "oral contingency agreement" between Malibu and IPP.

"Our investigation on this case has revealed that your client may be living with roommates who could be responsible for the infringement. This is why we intended to schedule the deposition. The same might very well have led to the need to move for leave to depose one or more of your client's roommates. Unfortunately, looking at the calendar for this case, our client is up against its second Rule 4(m) deadline to serve the Summons and Complaint. From my experience, Maryland judges have not always been amenable to multiple extensions of the Rule 4(m) deadline. And in this case, I can't see us agreeing on a protective order for my client (who will not hand over confidential information about its contracts without one), providing you declarations, contracts, and other information, and getting through the depositions in any sort of timely fashion that would allow us to proceed and serve reasonably quickly." Exhibit Y.

Nonsense. The foregoing is pure pretext, particularly given that Mr. Pietz offered to stipulate to a protective order, to an extension of the Rule 4(m) deadline and, and to extension of the discovery deadline. Pietz Decl., ¶ 41; Exhibit X, p. 1.

### III. MALIBU SHOULD BE ORDERED TO SHOW CAUSE AS TO WHY ALL EVIDENCE AND DATA FROM TOBIAS FIESER AND HIS COMPANY IPP SHOULD NOT BE EXCLUDED AND THESE CASES DISMISSED

On the present record, which is limited and somewhat unusual in that it involves a series of similar cases that almost never actually get into meaningful discovery, a show cause order is appropriate. Malibu's voluntary dismissal of the 3024 Action as soon as the witness contingency fee issues were raised suggests that simply attempting elucidate the relevant facts in normal discovery will not work; plaintiff would simply dismiss the case before letting it get that far.

Thus, as noted in the introduction, what is being requested in this motion is that Malibu be ordered to show cause on three factual issues and one resulting legal one, as follows: (1) confirm whether IPP and Fieser were engaged as contingent fee witnesses and detail the nature and extent of the relationship; (2) given the substantial documentary evidence suggesting otherwise, explain the statement made on the record to Judges Titus and Grimm denying that IPP is a front for Guardaley, and the apparent attempts to disguise Guardaley's behind-the-scenes role in these cases; (3) explain the

conflicting statements about whether it was IPP or Excipio software used to collect the data this case is

based on; and (4) assuming that IPP and Fieser do or did have a contingent interest in the outcome of

this litigation and that IPP is really a front for Guardaley, and that Malibu has been less than forthright

about all this, address what effect such champertous arrangements and lack of candor should have on

this and other similarly situated cases, in view of Movant's arguments in the Motion For An OSC that

preclusion and dismissal should result.

**(a)      Preclusion Of Evidence From Contingent Fee Witnesses Is Supported By Binding Fourth
          Circuit Precedent, Myriad Cases From Other Jurisdictions, Sound Public Policy, Common
          Law Principles, Rule Of Professional Conduct 3.4, And The Federal Anti-Gratuity Statute**

The Fourth Circuit has perhaps the strongest and clearest body of case law of any federal circuit

on exclusion of contingent fee witnesses.  Before focusing in the next section on how the rule against

contingent fee witnesses should be enforced in this case, this section explores the origin and scope of the

rule against contingent fee witnesses, and the sound public policy reasons that support it.

(1)      For Reasons Of Public Policy, The Fourth Circuit Affirmed Dismissal In *Accrued
          Financial*, Which Involved An Auditing Company Setup To "Mine" For Lawsuits

As noted, Judge Motz presided over the lead case in the Fourth Circuit's modern jurisprudence

on this issue in *Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 2000 WL 976800 at *3 n. 3, (D. Md. No.

1:99-cv-2573, ECF No. 20, 6/19/00) ("*Accrued Financial I*").  That case concerned a plaintiff outfit that

was engaged in what the Fourth Circuit would eventually describe as "lawsuit mining."  *Accrued Fin.

Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 298 (4th Cir. 2002) ("*Accrued Financial II*").

Specifically, Accrued Financial was a company that contracted with shopping mall tenants to audit

maintenance fees charged by landlords pursuant to commercial leases.  *Accrued Financial II,* at 297.

Apparently, landlords overcharging commercial tenants for maintenance fees was a ubiquitous problem,

such that Accrued Financial frequently uncovered claims, and was therefore paid 40-50% of any discrepancy discovered and collected.  *See id.* at 294.  Further, Accrued Financial also had its tenant clients execute, up front, an assignment that transferred to Accrued Financial "any and all causes of action [tenant] may have" against its landlord relating to the audit of periodic lease charges."  *Id.* at 295. The assignment gave Accrued Financial the right to control any resulting litigation, and to retain 40-50% of any net recovery (defined as total recovery lest attorney's fees and litigation costs).  *Id.*  The Fourth Circuit summarized the purpose of the assignments as being done by Accrued Financial to "further its business of uncovering claims and earning fees from collecting on them."  *Id.* at 297.  After its investigations revealed some particularly egregious maintenance fee misdeeds by two groups of landlords, Accrued Financial, as assignee of claims from 19 tenants, brought suit against the two landlord groups for civil RICO and other causes of action.  *Id.* at 296–97.

    At the district court, the defendants sought to dismiss the complaint, per Fed. R. Civ. P. 12(b)(6) and 17, on several grounds, including that Accrued Financial lacked standing to bring the claims because the alleged assignments were invalid as a matter of public policy.  *Id.* at 296.  Judge Motz held that "I need not decide the issues raised by these arguments since I find persuasive a broader contention made by defendants: that the assignments made by the tenants to [Accrued Financial] are void as a matter of public policy because they are champertous [fn]."  *Accrued Financial I*, *supra*, at pp. 2–3.[17] Judge Motz noted that that in addition to granting Accrued Financial a contingent interest in the outcome of litigation, the assignments also provided that Accrued Financial "employees will perform the audit services," and that Accrued Financial employees "intend to appear as audit witnesses at trial."  *Id.* at p. 3.  The court then turned to a choice of law analysis, noting that the assignments called for application of

---

[17] Page references to Judge Motz's decision below in *Accrued Fin. I* are from the PACER pagination.

California law, and that "[u]nder California law contingent fee witness agreements are clearly void as violative of public policy.  *See, e.g., Von Kesler v. Baker*, 21 P.2d 1017 (Cal. Dist. Ct. App. 1933); *Ojeda v. Sharp Cabriollo Hosp.*, 10 Cal. Rptr. 2d 230 (Ct. App. 1992).  Therefore, the assignments fail unless the parties' contractual choice of law is to be disregarded." *Accrued Financial I, supra*, at p. 3.

Judge Motz then explained the relevant choice of law analysis as follows:

> "the question becomes whether it would be contrary to a fundamental policy of either Maryland or the United States to refuse to enforce a contract providing for payment of a contingent fee to a witness.
>
> [Accrued Financial] has pointed to nothing to suggest that is so. To the contrary, the Maryland Rules of Professional Conduct applicable to members of the bar recognize that '[t]he common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying and that it is improper to pay an expert witness a contingent fee.' Md. Rules 16-812, Rules of Professional Conduct 3.4 cmt. (2000). In my judgment this rule is fundamentally sound. ***Financial arrangements that provide incentives for the falsification or exaggeration of testimony threaten the very integrity of the judicial process which depends upon the truthfulness of the witnesses***. [fn3]." *Id.* at p. 5 (emphasis added).

In the footnote to the foregoing, the court explained that even without the double negatives entailed by the issue arising in a choice of law context,

> "if Maryland or federal common law were found to apply to the issue, I would hold that ***witness contingency fee agreements affirmatively violate the fundamental policy of Maryland and the United States***. I recognize, as [Accrued Financial] argues, that firms providing auditing services to tenants in factory malls may provide an effective (and wholesome) deterrent to fraudulent billing practices by mall managers. However, they can do so without entering into contingency fee agreements. . . ." *Id.*, at fn 3 (emphasis added).

Thus, in *Accrued Financial I*, Judge Motz found the assignments granting Accrued Financial a contingent fee interest void as violative of public policy, and dismissed the complaint as to all of the assigned causes of action due to lack of standing.  *Id.* at p. 6.

Accrued Financial eventually appealed, and the Fourth Circuit affirmed in a published decision. *Accrued Financial II*, 298 F. 3d at 294.  In fact, the Fourth Circuit affirmed on two different grounds. *Id.* at. pp. 296, 300.

First, the Fourth Circuit concluded that "[w]e thus agree with the district court that, whether under the label of maintenance, champerty or barratry[18], the Assignments in this case violate Maryland's strong public policy against the stirring up litigation or promoting litigation for the benefit of the promoter rather than for the benefit of the litigant or the public." *Id.* at p. 300.   In reaching that conclusion, the Court of Appeals first focused on the nature of Accrued Financial's business. *Id.* at 297– 98.  It characterized Accrued Financial's agreements with its tenant clients as "essentially lawsuit-mining arrangements under which [Accrued Financial] 'mined for' and prosecuted lawsuits. . ." *Id.* at p. 297.  Accrued Financial "became a promoter of litigation principally for the sake of the fees that it would earn for itself and not for the benefit that it might produce for the tenant, the real party in interest . . . ." *Id.* Arrangements "to intermeddle and stir up litigation for the purpose of making a profit . . . violate Maryland's strong public policy against stirring up litigation and are therefore void and unenforceable in Maryland." *Id.* at 298.  Reviewing the relevant law, the Fourth Circuit noted that despite the metamorphosis of the law over the years, vestiges of the traditional common law prohibitions of barratry, maintenance and champerty still survive in Maryland. *Id.* at 298–300.  After demonstrating that "the current fundamental public policy of Maryland prohibits schemes to stir up and promote litigation for the benefit of the promoter rather than for the benefit of the real party in interest" (*id.* at p. 299) the Fourth Circuit agreed that the assignments at issue violated that policy (*id.* at p. 300).

---

[18] *See generally* Paul Bond, "Making Champerty Work: An Invitation To State Action" 150 U. Pa. L. Rev. 1297 (April, 2002) (explaining history and typology of these terms and arguing that legal doctrine of champerty, when properly understood, is "[v]ital and [i]rreplaceable" and should be revitalized); Max Radin, *Maintenance by Champerty,* 24 Cal. L. Rev. 48 (1935-36) (cited by Fourth Circuit in *Accrued Financial II*, 298 F.3d at 298).

Second, "In addition to our conclusion that the Assignments violate Maryland's public policy against barratry, we also conclude that ***the arrangements are against public policy insofar as they provide for supplying expert testimony for a contingent fee***. To the extent that [Accrued Financial] employees, as experts on the relationship between landlords and tenants in a commercial context, planned to testify regarding the allegations in this litigation, [Accrued Financial] was offering expert testimony for a contingent fee. Such an arrangement would also violate public policy, as articulated more fully by the district court." *Id.* at p. 300 (emphasis added).

> (2)    *Farmer* And Cases From Other Jurisdictions Confirm That District Courts Must Strike Evidence From Contingent Fee Experts

In *Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001) (Legg, J.) *aff'd on other grounds*, 43 Fed. Appx. 547, 551 (4th Cir. 2002), Judge Legg followed *Accrued Financial II* in striking a report prepared by a contingent fee expert.  There, the defendants filed a motion to strike the report of an expert, Dr. Lerner, because the plaintiff Farmer had "hired" him "on a contingency basis." *Id.* 159 F. Supp. at 883.

> "When questioned about this at oral argument, Farmer's counsel explained that his client lacked the funds necessary to pay an expert in advance. This explanation is unsatisfactory. Under the common law in most jurisdictions, including Maryland, "it is improper to pay an expert witness a contingent fee." Md. Rules 16-812, Rules of Professional Conduct 3.4 cmt. (2000). [fn.33] As Chief Judge Motz of this Court observed, 'witness contingency fee agreements affirmatively violate the fundamental policy of Maryland and the United States.' *Accrued Financial Services, Inc. v. Prime Retail, Inc.*, 2000 WL 976800 at *3 n. 3 (D.Md. June 19, 2000). *See Cosgrove v. Sears Roebuck and Co.*, 1987 WL 33595 (S.D.N.Y. Dec.21, 1987).[fn.34]
>
> Accordingly, the Court will, by separate order, grant defendants' motion and strike Lerner's reports." *Id.* at 883–84.

In reaching that decision, at footnote 34, Judge Legg noted that " In *Accrued Financial*, this Court held that 'financial arrangements that provide incentives for the falsification or exaggeration of testimony

threaten the very integrity of the judicial process which depends upon the truthfulness of the witnesses.' 2000 WL 976800 at *3." _Id._ at fn.34.

The great weight of authority from most other jurisdictions similarly holds that evidence from expert witnesses paid on contingency must be excluded and any contracts providing for such payments are void. _See, e.g., Straughter v. Raymond_, 2011 U.S. Dist. LEXIS 53195, at *9-10 (C.D. Cal. May 9, 2011) (collecting cases and holding that contingent fee expert was _per se_ excluded).[19]

---

[19] _See, e.g., Caldwell v. Cablevision Sys. Corp._, 984 N.E.2d 909, 912, 960 N.Y.S.2d 711 (N.Y. 2013) ("What is not permitted and, in fact, is against public policy, is any agreement to pay a fact witness in exchange for favorable testimony, where such payment is contingent upon the success of a party to the litigation."); ; _Commonwealth v. Miranda_, 458 Mass. 100, 934 N.E.2d 222, 229 n.15 (Mass. 2010) ("[c]ompensation to fact witnesses  is said to violate the integrity of the judicial system, to undermine the proper administration of justice, and to be contrary to a witness's solemn and fundamental duty to tell the truth."); _In re SMTC Mfg._, 421 B.R. 251, 264 n.2 (W.D. Tex. Bankr. 2009) (noting prior dismissal of expert witness retained under contingency fee arrangement); _Followill v. Merit Energy Co._, 2005 WL 5988695, at *1 (D. Wyo. Apr. 11, 2005) (granting defendants' motion to exclude plaintiffs' expert witness and strike his expert report because the witness was paid on a contingency basis); _Ouimet v. USAA Casualty Ins. Co._, 2004 U.S. Dist. LEXIS 31199, 2004 WL 5865274, at *2 (C.D. Cal. Jul. 14, 2004) (excluding expert's testimony, in part, because it "would run directly afoul of [Rule 5-310 of the California Rules of Professional Conduct], as her compensation under the contingency fee agreement depends upon the outcome of the case."); _City & Cnty. of Denver v. Board of Assessment Appeals_, 947 P.2d 1373, 1379 (Colo. 1997) (Colorado supreme court vacated decisions in valuation proceedings because the appraisers who had testified were salaried employees of appraisal firms "that had executed contingent fee agreements with taxpayer clients."); _Westin Tucson Hotel Co. v. State_, 936 P.2d 183, 190 (Ariz. App. 1997) ("...a contract providing for compensation of a witness  contingent on the success of the litigation is subversive of public justice for the reason that his evidence may be improperly influenced. Public policy considerations brand such a contract illegal."); _Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n_, 865 F. Supp. 1516, 1526 (S.D. Fla. 1994) (excluding fact witness as a sanction where lawyer "violated the very heart of the integrity of the justice system"); _Cosgrove v. Sears Roebuck & Co._, 1987 U.S. Dist. LEXIS 11696, 1987 WL 33595, at *1-2 (S.D.N.Y. Dec. 21, 1987) (precluding testimony of expert witness paid on contingency fee basis, but allowing party sixty days to designate new expert witness); _In re Schapiro_, 128 N.Y.S. 852, 858 (N.Y. App. Div. 1911) ("A witness who . . . receives compensation or a promise of compensation for giving his testimony is necessarily a discredited witness."); _see also United States v. Singleton_, 144 F.3d 1343, 1347 (10th Cir. 1998) (contracts to pay fact witnesses are void as violative of public policy), _vacated on other grounds_, 165 F.3d 1297 (10th Cir.), _cert. denied_, 119 S. Ct. 2371 (1999); _Hamilton v. General Motors Corp._, 490 F.2d 223, 228-229 (7th Cir. 1973) (holding that paying fact witnesses for testimony is against public policy and refusing to allow payment for testimony); _Reffett v. C. I. R._, 39 T.C. 869, 878 (1963) ("[I]t seems to be a rather generally accepted rule that all agreements to pay witnesses extra compensation contingent on the success of the lawsuit are against public policy whether the agreement is with an ordinary witness, an expert witness, or a witness who cannot be compelled to testify, because such agreements constitute a direct temptation to commit perjury.").

On the other hand, as Judge Snider of the Central District of California recently noted in a decision collecting cases from across the country, "[o]ther courts have rejected *per se* exclusion of contingent fee expert witnesses, preferring to allow the factfinder to assess the credibility of such witnesses at trial." *Straughter*, 2011 U.S. Dist. LEXIS 53195, at *10–11 (noting that many courts exclude contingent fee witnesses *per se*, but other courts view the issue as one of credibility, and siding with the courts that take the *per se* exclusion approach) *citing Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1042 (7th Cir. 1988) ("[i]t is unethical for a lawyer to employ an  expert witness on a contingent-fee basis, it does not follow that evidence obtained in violation of the rule is inadmissible.") (citation omitted); *Universal Athletic Sales Co. v. Am. Gym, Recreational & Athletic Equip. Corp.*, 546 F.2d 530, 539 (3d Cir. 1976) (although rules of professional responsibility "inveighs against" attorney testifying as expert witness for client of his law firm, "it does not necessarily follow that any alleged professional misconduct on his part would in itself render his testimony, once it was adduced, a nullity."); *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 69 (N.D. Ill. Bankr. 2002) (holding that the Federal Rules of Evidence do not bar testimony from contingent fee experts).

Notwithstanding those jurisdictions that take a different view, Movant agrees with Judge Snider's ultimate conclusion and would urge this court to reaffirm "that the better course of action is to exclude the testimony of expert witnesses in civil cases whose compensation is contingent on the outcome of the case." *Straughter*, 2011 U.S. Dist. LEXIS 53195, at *11.  Such a result is not only the better answer conceptually, but it squares with Fourth Circuit jurisprudence on the subject, at least some of which is binding and on point, as applied in *Accrued Financial I and II*, and *Farmer*.

     (3)   <u>Maryland Rule Of Professional Conduct 3.4 And The Federal Anti-Gratuity Statute Also Support Preclusion And Dismissal</u>

Of course, one of the reasons that courts exclude contingent fee witness evidence is that such arrangements are contrary to the rules of professional conduct.  Under the current Model Rules of Professional Conduct, which have been adopted in Maryland, "Rule 3.4 Fairness to Opposing Party and Counsel - A lawyer shall not: . . .(b). . .offer an inducement to a witness that is prohibited by law." The Comment to Rule 3.4 explains that, "With regard to paragraph (b). . . .The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying and that ***it is improper to pay an expert witness a contingent fee***." (emphasis added).  *Id.* at Comment to Rule 3.4.

Moreover, the Federal Anti-gratuity statute makes it a crime to give or promise anything of value for testimony under oath. Specifically, it states that:

> "Whoever . . . directly or indirectly, gives, offers or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court . . . authorized by the laws of the United States to hear evidence or take testimony . . . shall be fined under this title or imprisoned for not more than two years, or both." 18 U.S.C. § 201(c)(2).

If done "corruptly," there is also a violation of §201(b)(3) of the same statute. The legislative intent behind Section 201(c)(2) "indicates Congress's belief that justice is undermined by giving, offering, or promising anything of value for testimony." *Centennial Mgmt. Servs. v. Axa Re Vie*, 193 F.R.D. 671, 681 (D. Kan. 2000); *see also <u>United States v. Levenite</u>*, 277 F.3d 454, 462-463 (4th Cir. 2002); *<u>United States v. Singleton</u>*, 144 F.3d 1343, 1345 (10th Cir. 1998), vacated on other grounds, 165 F.3d 1297 (10th Cir.), cert. denied, 119 S. Ct. 2371 (1999).

(4)     Court's Sanction Authority And Supervisory Power Are Also Tools That May Be Invoked To Remedy A Contingent Fee Witness Situation

Beyond the foregoing wellsprings of authority, this Court also has the power to sanction under Rules 11 and 37, 28 U.S.C. § 1927, and, where conduct rises to the level of bad faith, under its inherent sanction authority.  Fed. R. Civ. P. 11; Fed. R. Civ. P. 37; 28 U.S.C. § 1927; *Chambers v. Nasco*, 501 U.S. 32 (1991).

Rule 11 provides for monetary and non-monetary sanctions where a signed paper is submitted for an improper purpose, a legal claim is unwarranted, or factual contentions or denials are made unreasonably.  Fed. R. Civ. P 11(b) and (c).  Rule 37 allows for dismissal of an action in whole or in part when a court's discovery order has been disobeyed.  Fed. R. Civ. P. 37(b)(2)(A)(v).  Section 1927 meanwhile makes counsel liable for vexatious multiplication of proceedings.  28 U.S.C. § 1927.

In addition, "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process, the court has the inherent power to dismiss the action."  *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993) ("*Shaffer*").  On the Fourth Circuit,

> "before exercising the inherent power to dismiss a case, a court must consider the following factors: (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney, recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and  deterring similar conduct in the future; and (6) the public interest."  *Id.* at 462-463.

In *Zaczek v. Fauquier County, Va.*, 764 F. Supp. 1071, 1079 (E.D. Va. 1991) *aff'd without opinion by* 16 F.3d 414, 1993 U.S. App. LEXIS 37694 (4th Cir. Va. 1993) *and by* 1993 U.S. App. LEXIS 34391 ("we

affirm on the reasoning of the district court")[20], the case was dismissed, in part, because the district court found that plaintiff's misconduct caused defendants "unnecessary expenses for costs and attorneys fees." *Zaczek*, 764 F. Supp. at 1079; *see also Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (affirming sanction striking plaintiff's complaint with prejudice and awarding fees to defendant, where district court undertook careful balancing and made specific findings, including a finding that no lesser sanction was adequate).

There is also one final source for the Court's authority to remedy contingent fee witness arrangements: the supervisory power vested in all federal courts. *See Williamson v. United States*, 311 F.2d 441 (5th Cir. 1962) (relying on supervisory power to overturn a conviction because the sole evidence against appellant was the testimony of a contingent fee informer); *cf. Communist Party v. Subversive Activities Control Board*, 351 U.S. 115, 124 (1956) (civil case relying on supervisory power to reverse the administrative board's judgment because it was "taint[ed]" by the testimony of three perjurious witnesses, despite the fact that there was sufficient untainted evidence to uphold the board's judgment); *Dixon v. District of Columbia*, 394 F.2d 966 (D.C. Cir. 1968) (in criminal case, where prosecutor entered into agreement that was against public policy, it was held that prosecution was impermissibly brought and that the court's supervisory power was to be used to protect the purity of the government and its processes).

"Although supervisory power has been used much more frequently in criminal cases, the Supreme Court has occasionally employed supervisory power for similar purposes in civil cases." Beale, "Reconsidering Supervisory Power in Criminal Cases: Constitutional and Statutory Limits on the Authority of the Federal Courts," 84 COLUM. L. REV. 1433, 1441 (1984) *citing, inter alia, Thiel v.*

---

[20] The Fourth Circuit's disposition of *Zaczek* is unpublished.

_Southern Pac. Co._, 328 U.S. 217 (1946).  One commentator, in a law review article cited by the U.S. Supreme Court itself,[21] has suggested that the development and exercise of supervisory authority by federal courts was "heavily influenced" by an increasing awareness of abusive investigative practices. Beale, "Reconsidering Supervisory Power in Criminal Cases: Constitutional and Statutory Limits on the Authority of the Federal Courts," 84 COLUM. L. REV. 1433, 1441 (1984) (noting that that federal court's supervisory power arose during era of "Prohibition, Entrapment, Wiretaps and the Third Degree" and suggesting likely causal linkage).

Judge Wright, in the Prenda case, noted that this kind of John Doe copyright infringement litigation shares some similarities, as well as key differences, with investigations of cybercrimes,

> "copyright lawsuits brought by private parties for damages are different than criminal investigations of cybercrimes, which sometimes require identification of an individual through an IP address. In these criminal investigations, a court has some guarantee from law enforcement that they will bring a case only when they actually have a case and have confidently identified a suspect. In civil lawsuits, no such guarantees are given. So, when viewed with a court's duty to serve the public interest, a plaintiff cannot be given free rein to sue anyone they wish—the plaintiff has to actually show facts supporting its allegations." _Ingenuity 13, LLC v. John Doe_, C.D. Cal. No. 12-cv-8333, ECF No. 48, 2/7/13 (Order to show cause re sanctions).

Thus, exercise of the court's supervisory power would not be wholly out of place in this private attorney general context.  Indeed, when Judge Snider described courts as relying on their "authority to forestall violations of ethical principles," to exclude contingent fee witnesses, that sounds a lot like the supervisory power in action, even if it has not been identified as such.  _See Straughter_, 2011 U.S. Dist. LEXIS 53195, at *8.

---

[21] _Thomas v. Arn_, 474 U.S. 140, fn.5 (1985)

**(b)   Malibu's Arrangement With IPP Violates The Fourth Circuit's Rule From *Accrued Financial* That An Investigative Company Cannot Have A Contingent Fee Interest In Litigation It Is In The Business Of Stirring Up**

Here, like the investigative audit firm Accrued Financial, Guardaley and IPP are companies (perhaps one company) whose principal business consists of "trolling" or "mining" for lawsuits. Though not originally a real party in interest itself, Accrued Financial marketed what amounted to specialized auditing and investigative services calculated to discover potential legal claims that others might bring.  Guardaley and IPP do the same thing, but they investigate and log BitTorrent downloads on behalf of pornographers, instead of lease documentation on behalf of commercial shopping center tenants. Like copyright infringement, landlords overcharging commercial tenants for periodic maintenance fees is apparently a ubiquitous problem; both are realms where, unfortunately, legal obligations are too often ignored.  Further, both are realms where each individual harm a defendant causes is relatively small, but the harms add up, such that there is real money to be made in litigation if the claims can be aggregated and pursued *en masse*.  Courts recognize that the kind of investigation and claim aggregation services companies like Accrued Financial and IPP provide "may provide an effective (and wholesome) deterrent." *Accrued Financial I*, *supra*, fn.3

However, the clear message from Judge Motz and the Fourth Circuit is that what companies like Accrued Financial and IPP may ***not*** do is take a contingent fee interest in the outcome of the litigation that they are in the business of stirring up.  In the words of Judge Motz, to allow such financial arrangements would "'provide incentives for the falsification or exaggeration of testimony threaten the very integrity of the judicial process which depends upon the truthfulness of the witnesses.'"  *Farmer*, 159 F. Supp. 2d at 883; *quoting Accrued Financial I*, at p. 3.  It is as true here as it was in *Accrued Financial* that "witness contingency fee agreements affirmatively violate the fundamental policy of

Maryland and the United States." *Accrued Financial I*, at fn.3.  Whatever may be said of the related and sometimes indistinguishable doctrines of maintenance, champerty and barratry in other jurisdictions, the Fourth Circuit has recently confirmed in *Accrued Financial II* that they survive in Maryland.  *Id*.

The only real material difference between the Malibu cases and the scenario in *Accrued Financial* was that there, the promoter of the litigation scheme actually took assignment of the claims it uncovered.  In this respect, the Prenda litigation was an even closer analogue to *Accrued Financial* than are the Malibu cases.  What Judge Wright found in the Prenda cases was that the lawyers (who also owned the computer investigative company) became their own "clients" through a web of fraudulent assignments and offshore shell companies.  *Ingenuity 13, supra*.  Here, there is a real client (i.e., Malibu Media, LLC), and two tiers of lawyers (both national counsel in Miami at Lipscomb, Eisenberg & Baker, and local counsel here, Mr. Hoppe) with an interest (presumably, a contingent interest) in the outcome of these cases.  But what the verified discovery response from Illinois shows is that the key witness harvesting the data on which the lawsuits are based (i.e., Fieser/IPP) has also become, partially, a real party in interest, through the "oral contingency agreement."  Put another way, if Accrued Financial had not taken assignment to the claims there, but merely performed an investigation and then sought to testify as an expert for the tenants, pursuant to an "oral contingency agreement," should the case have come out differently?  The second part of the Fourth Circuit's holding in *Accrued Financial II* generally prohibiting contingent fee experts,[22] as well as the great weight of authority from other jurisdictions would all suggest not.  *See, e.g., Farmer,* 159 F. Supp. at 883–84.[23]

---

[22] Where the Court held that "the arrangements are against public policy insofar as they provide for supplying expert testimony for a contingent fee."  *Accrued Financial II*, 298 F. 3d at 300.

[23] *See also* all of the other, similar cases from other jurisdictions cited in Section III(a)(2), supra.

Since _Accrued Financial_ involved an assignment, dismissal arose in the context of a Rule 12(b)(6) motion, on the theory that the investigative company lacked standing to sue because the contingent fee assignments giving in the right to sue were void as against public policy.  Here Malibu has effectively assigned _part_ of its interest in the litigation to the investigator, IPP, and dismissal should still result for the same reasons that underlie the dismissal in _Accrued Financial_.  However, instead of dismissal coming under the authority of Rule 12, here the more appropriate too is an exercise of the Court's supervisory power, in order to protect the integrity of the judicial process and forestall ethical violations, or as a sanction.  _See Accrued Financial II_, 298 F. 3d at 294 (dismissal of case under Rule 12 where contingent fee "lawsuit mining" undermined integrity of court's fact finding process); _Straughter_, 2011 U.S. Dist. LEXIS 53195, at *11 (preclusion under, _inter alia_, court's authority to forestall ethical violations); _Williamson_, 311 F.2d at 441 (relying on supervisory power to overturn a conviction because the sole evidence against appellant was the testimony of a contingent fee informer); _Communist Party_, 351 U.S. at 124; (civil case relying on supervisory power to reverse the administrative board's judgment because it was "taint[edl" by the testimony of three perjurious witnesses, despite the fact that there was sufficient untainted evidence to uphold the board's judgment); _Shaffer_, 11 F.3d at 462 (discussing dismissal as a sanction); _Zaczek_, 764 F. Supp. at 1079 (same).

**(c)      Additional Facts Supporting Exclusion And Dismissal: Central Importance Of IPP's Evidence, Suspect Nature Of The "Oral Contingency Agreement," Malibu's Repeated Avoidance Of Discovery And Lack Of Candor**

As noted by the Colorado Supreme Court, "where the Rules of Professional Conduct become intertwined with litigation and a potential ethical violation threatens to prejudice the fairness of the proceedings, a trial court may consider the issue not as a disciplinary matter but rather within the context of the litigation." _Mercantile Adjustment Bureau, L.L.C. v. Flood_, 278 P.3d 348, 354 (Colo. 2012).

Similarly, in considering dismissal *as a sanction*, the Fourth Circuit's six-factor analysis from *Shaffer* also focuses heavily on how sanctionable conduct fits into the broader context of the litigation. *See Shaffer*, 11 F.3d at 462–63 (factors to consider in dismissal as a sanction are: (1) wrongdoer's culpability; (2) client's blameworthiness; (3) prejudice to judicial process; (4) prejudice to victim; (5) availability of other sanctions; (6) public interest).

Here, the context of the litigation favors not just preclusion of evidence from IPP and Fieser, but outright dismissal of the case.

(1)   Multiple Facts Suggest "Wrongdoer's Culpability": The Concerted Effort To Avoid A Paper Trail, Dismissing The 3024 Action, Omission Of Adverse Facts In The *Ex Parte*, The Statements Denying IPP's Links To Guardaley

Applying the first *Shaffer* factor here, multiple facts establish the culpability of the wrongdoer:

(A)   *The Very Existence Of An "Oral Contingency Agreement" With A Witness Is Inherently Suspicious*

Just speaking out loud the words "witness oral contingency agreement" should give even a first year law student pause. Indeed, the very existence of an "oral" agreement brokered not by Malibu, but its counsel clearly demonstrates a deliberate attempt to prevent the creation of a discoverable paper trail and to frustrate discovery into what Malibu and its counsel knew was an prohibited fee arrangement. Again, neither Malibu nor its counsel are novice litigants. No reasonable, competent attorney admitted to practice before this Court would so carelessly enter into an "oral contingency agreement" with a key witness. *See generally White v. General Motors Corp., Inc.*, 908 F.2d 675, 680 (10th Cir. 1990) (in the context of Rule 11 "[a] good faith belief in the argument is not sufficient; the attorney's belief must also be in accord with what a reasonable, competent attorney would believe under the circumstances").

(B)     *Malibu's Dismissal Of The 3024 Action And Attempt To Avoid Scrutiny Of IPP*
        *"Indicates An Improper Purpose For The[se] Suits"*

In this district, Malibu has actively frustrated discovery into its relationship with IPP by

unilaterally filing a notice of voluntary dismissal of a case rather than address the contingent fee witness

issue. *Compare* Exhibit X p. 3 (email from Jon Hoppe promising "comprehensive response" on

contingent fee witness issue in the 3024 Action) *with* Pietz Decl., ¶ 43 (notice of voluntary dismissal

filed in the 3024 Action three days later). The reasons offered for this dismissal (*see* Exhibit Y) are

clearly pre-textual and do not add up, given that Mr. Pietz had offered to stipulate to an extension of the

Rule 4(m) deadline and a protective order (Pietz Decl., ¶ 41; Exhibit X, p. 1). The facts suggest that Mr.

Hoppe or a colleague of his looked at the Maryland cases cited in the Colorado motion (Exhibit X, pp.

9–10) and then preemptively dismissed the 3024 Action so as to avoid scrutiny of the witness

contingency fee issue by Judge Motz.

Such a tactic is not unheard of in these industrial-scale pornographic infringement lawsuits. In

fact, such a thing has occurred before in the Fourth Circuit. In *K-Beech, Inc. v. Does 1-85*, 2011 U.S.

Dist. LEXIS 124581, 6-7 (E.D. Va. Oct. 5, 2011), Judge Gibney confronted a similar situation,

> ". . . .***When any of the defendants have filed a motion to dismiss or sever themselves
> from the litigation, however, the plaintiffs have immediately voluntarily dismissed them
> as parties to prevent the defendants from bringing their motions before the Court for
> resolution***.
>
>            This course of conduct indicates that the plaintiffs have used the offices of the
> Court as an inexpensive means to gain the Doe defendants' personal information and
> coerce payment from them. The plaintiffs seemingly have no interest in actually litigating
> the cases, but rather simply have used the Court and its subpoena powers to obtain
> sufficient information to shake down the John Does. Whenever the suggestion of a ruling
> on the merits of the claims appears on the horizon, the plaintiffs drop the John Doe
> threatening to litigate the matter in order to avoid the actual cost of litigation and an
> actual decision on the merits.
>
>            ***The plaintiffs' conduct in these cases indicates an improper purpose for the
> suits***." *Id.* at *6–7 (emphasis added).

Nor is Malibu's transparent attempt to avoid scrutiny of IPP an isolated incident. Nearly every Malibu case that proceeds to substantive discovery has been meet with obfuscation and misdirection. Numerous motions to compel even the most basic discovery have been filed across multiple jurisdiction. *See, e.g.*, *Malibu Media, LLC v. Hinds*, et al., Case No. 1:12-cv-01117, Def't Michael Harrison's Brief in Support of Motion to Compel Discovery (ECF Doc. 151-3)(S.D. Ind. Jan 9, 2014); *Malibu Media, LLC v. John Doe*, N.D. Ill. No. 1:13-cv-6312, ECF No. 44, 2/21/14 (order granting motion for OSC re Rule 37 sanctions, ordering Malibu to explain why it should not be sanctioned for failing to disclose information about IPP). Malibu has also routinely refused to make any representative of, or documents in the possession of IPP available to the defendants. In one instance, in response to Malibu's refusal to make IPP's representative available for deposition, the Honorable John J. Tharp, Jr. ordered that:

> "Mr. Fieser must appear for deposition in this district…or the plaintiff will not be permitted to rely on any evidence supplied by Mr. Fieser going forward." *Malibu Media, LLC v. Bochnak*, N.D. Ill. No. 1:12-cv-7030, ECF No. 36, 9/5/13 (granting defendants motion to compel).

Like several other, prior instances where litigants have gotten into discovery on IPP, case was "resolved" in a matter of days after Mr. Fieser was ordered to appear. By using a foreign company based outside the United States to collect evidence and routinely identifying it as a witness, then turning around and refusing to make that witness available, the Plaintiff is essentially insulating IPP from any examination by Defendant.

    (C)   *Malibu Omitted Adverse Facts When It Moved Ex Parte For Early Discovery, In Violation Of The Rules Of Professional Conduct*

ABA Model and Maryland Rules of Professional Conduct, Rule, 3.3(d) provides that "In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse".

- 40 -

Common sense and the slew of cases cited in Section III(a)(2), above, all suggest that the Court *might* have excluded or, at the very least, looked more skeptically at the Fieser declaration if the Court knew it was coming from a contingent fee witness.  Thus, disclosing Fieser and IPP's contingent interest in the litigation as an adverse fact as part of the *ex parte* early discovery requests would be required under Rule 3.3(d).

Perhaps this issue just slipped counsel's mind. . .1,800+ times.  Or, as obviously seems more likely, the existence of the "oral contingency agreement" was deliberately withheld and not communicated by national counsel, Mr. Lipscomb, (who negotiated the agreement, after all) so that the various local counsel doing the filings could plead ignorance.

      (D)    *IPP Is Really A Front For The Discredited, Unreliable German Firm Called Guardaley, And Someone Appears To Have Affirmatively Misled Judges Titus And Grimm On This Issue*

As noted, during the prior consolidated phase of the Malibu litigation in this district, when counsel for a John Doe pointed out IPP's links to Guardaley, Malibu's lawyers pooh-poohed any such connection, in writing, on the record.  "The German investigative company Guardaley has not reinvented itself as IPP, Ltd." *Malibu Media, LLC v. John Doe*, D. Md. No. 8:13-cv-360-RWT, ECF No. 15, 3/23/13, p. 18 (Exhibit S).  Malibu even went so far as to dismiss the suggestion that IPP was really just a front for Guardaley as "conspiracy theories" set forth by adverse counsel "with little evidence." *Id.* at p. 17.

What the exhibits to the Pietz Decl. show, in aggregate, is that the connection between IPP and Guardaley looks more like an actual conspiracy, based on a fairly extensive body of documentary evidence.  There are too many links between the two companies to dismiss the connection as a conspiracy theory.  Most telling of all is the story from *Wired* magazine quoting "Patrick" (presumably,

Patrick Achache of Guardaley) as having a standard practice of to creating new shell companies in each different jurisdiction so as to keep Guardaley's role clandestine.  Exhibit N.  Thus, the statement on the record to Judges Titus and Grimm on this issue appears to be anything but candid.

Further, the proceedings before the State Court of Berlin in Germany suggest that Guardaley, and by extension IPP, should not be trusted.  As noted, (1) the German court made a finding that Guardaley's investigative methods were unreliable, (2) when Guardaley was confronted with the fact that it was causing unjustified case and desist letters to be sent out it attempted to the hide the problem, and (3) the German court essentially concluded that Guardaley was running a honeypot by means of a "falsified bit field."  Pietz Decl., ¶¶ 10–25; Exhibits D to K.

* * *

All of the foregoing facts militate against shrugging off the contingent fee arrangement as an honest mistake made by inexperienced counsel who did not know any better; rather, it appears key adverse facts are being concealed on purpose.  Similarly, Fieser and IPP are not an otherwise-reliable witness; rather, they are nothing more than a front for Guardaley, which Malibu and its lawyers have also tried to hide by making statements to the Court that appear to be misleading. *Compare* Exhibit S, p. 18 (Malibu's statement to Judges Titus and Grimm that "The German investigative company Guardaley has not reinvented itself as IPP, Ltd.,") *with* Pietz Decl. ¶¶ 26–38, Exhibits L to V (detailing links between Guardaley and IPP).  Accordingly, the "culpability of wrongdoer" factor in the *Shaffer* analysis weighs heavily in favor of dismissal.

(2)    Fieser's Technical Observations Constitute The Key Factual Predicate For The Entire Complaint, Meaning That The Contingent Fee Arrangement Here Is Highly Prejudicial Both To Movant And To The Judicial Process

Without Fieser's data, which he purports to have "personally extracted" (Fieser Decl., ¶ 11 ) using IPP software that monitors BitTorrent downloads (*id.* at ¶ 9) there is no factual basis whatsoever for Malibu's complaint for copyright infringement.  The fact that the contingent fee witness is central to—indeed, the very foundation of—plaintiff's case should weigh heavily in favor of dismissal; without Fieser's data, there is no case at this stage.  *See* Complaint ¶¶ 18–28; Fieser Decl. (Exhibit A).

Thus, the fact that tainted evidence comprises the main factual underpinning on which the whole complaint is based is highly "prejudicial to the victim," i.e., Movant, and this *Shaffer* factor weighs heavily in favor of dismissal.  But for Fieser's technical monitoring, Movant would not be here today incurring costs and attorneys fees in arguing this issue. *See Zaczek*, 764 F. Supp. at 1079 (affirming dismissal with prejudice, in part, because plaintiff's misconduct caused defendants "unnecessary expenses for costs and attorneys fees.")

Malibu's apparent obfuscation of the links between IPP and Guardaley, and their apparent financial interest in this litigation, has also prejudiced the ability of Movant and similarly situated defendants to seek appropriate discovery.  The notion that 'systematic opportunist / troll' entities should be required to fully disclose all parties with a pecuniary interest in the litigation at the outset of proceedings is an idea that is picking up steam in the U.S. Congress, at least in the patent context.[24]  At the very least, when defendants start pointing out that the key witness appears to be a special-purpose

---

[24] *See* http://legalnewsline.com/news/247947-senate-committee-to-consider-leahys-patent-reform-bill (last accessed March 19, 2014) (explaining that Senator Leahy's S.B. 1720, which was recently introduced and referred to the Senate Judiciary Committee for consideration on March 27, 2014, is similar to the "more ambitious" Innovation Act pending in the House in that they would both require that "the person or organization that holds the patent and files an action in federal court would have to disclose any and all persons that have a financial interest in the proceedings, or that could be affected by the outcome.")

shell company used to hide connections to a discredited predecessor firm, Malibu should not make affirmative statements calculated to mislead on that point. The statements by Malibu to Judge Titus and Judge Grimm (Exhibit S) are prejudicial because they kept the universe of defendants from investigating this issue sooner.

Similarly, for the reasons originally noted by Judge Motz, a scheme where a contingent fee witness has a stake in the outcome of the litigation it is in the business in stirring up is highly "prejudicial to the judicial process," so this *Shaffer* factor also favors dismissal. As one court stated in an order imposing sanctions on Malibu Media, "[T]hese internet copyright infringement cases already give off an air of extortion . . . ." *Malibu Media, LLC v. Doe,* Case No. 3:13-cv-00209, Opinion & Order (ECF Doc. 27) (E.D. Wis. Sept. 10, 2013) (internal citations omitted). The contingent fee witness issue only further fouls the air surrounding these cases because "[f]inancial arrangements that provide incentives for the falsification or exaggeration of testimony threaten the very integrity of the judicial process which depends upon the truthfulness of the witnesses." *Farmer*, 159 F. Supp. 2d at 883 *quoting Accrued Financial I*, *supra*, at p. 3; *Accrued Financial II*, 298 F. 3d at 294–300. Even if Guardaley/IPP has improved its software since the 2011 German court case, that the firm was so roundly discredited in the past (*see* Pietz Decl., ¶¶ 10–25) should only further erode the Court's tolerance for allowing such a firm to stir up nearly 2,000 champertous federal lawsuits.

    (3)    <u>The Public Interest, Lack Of Other Effective Sanctions, And Unusual Role Of The "Client" Also All Militate In Favor Of Dismissal</u>

    (A)    *On Balance, These Lawsuits Are Against The Public Interest*

After noting the strong incentives to settle created by the pornographic nature of the content at issue in this kind of suit in the consolidated Prenda cases in California, Judge Wright stated, "This Court has a duty to protect the innocent citizens of this district from this sort of legal shakedown." *See AF*

_Holdings, LLC v. John Doe_, C.D. Cal. Case No. 2:12-cv-5712-ODW, ECF No. 9, 10/19/12 (order vacating subpoenas in 45 _single-Doe_ cases requiring plaintiff to explain before applying for new subpoenas "how it would proceed to uncover the identity of the actual infringer once it has obtained subscriber information—given that the actual infringer may be a person entirely unrelated to the subscriber—while also considering how to minimize harassment and embarrassment of innocent citizens."); _Ingenuity 13, LLC v. John Doe_, C.D. Cal. No. 12-cv-8333-ODW, ECF No. 28, 12/20/12 (same).

With similar concerns in mind, the Judges of this district went to great lengths to craft a balanced approach that would guard against abuse, but also let Malibu proceed with its claims for infringement. _See Malibu Media, LLC v. John Doe_,  D. Md. No. 8:13-cv-0360-RWT, ECF Nos. 9, 31 (panel proceedings before Judges Titus and Grimm).  As it now turns out, during the crucial proceedings before Judges Titus and Grimm, Malibu was making what appear to be misleading statements to the Court downplaying IPP's links to Guardaley.  Further, at no point did anyone associated with Malibu—and it should be noted that Mr. Lipscomb, who negotiated the "oral contingency was a part of the consolidated panel proceedings in Maryland—bother to mention IPP's contingent interest in the outcome of the litigation.  As Judge Wright observed in the Prenda case, if the lawyers there had "disclosed that they had the sole financial interest in the suit, a court would scrutinize their conduct from the outset. But by being less than forthcoming, they defrauded the Court."  While two-Judge panel in Maryland certainly scrutinized Malibu's conduct from the outset, it apparently did so without being appraised of key adverse facts, which might have altered the terms on which Malibu was allowed early access to the Court's subpoena power.

Malibu has repeated its sin of omission in each *ex parte* motion it has filed since the consolidated proceedings before Judges Titus and Grimm concluded. Even now that contingent fee witness issue has been brought to the attention of local plaintiff's counsel,[25] Malibu continues to file new cases and seek discovery *ex parte* without disclosing the "oral contingency agreement." *See, e.g., Malibu Media, LLC v. John Doe*, D. Md. No. 8:14-cv-747-JFM, ECF No. 4 and 4-4 (March 12, 2014 early discovery motion not mentioning the "oral contingency agreement" and relying on same Fieser Decl. as older cases).

The result of this Court's measured approach to date, and Malibu's all-too-convenient omission of key adverse facts from *ex parte* proceedings, has been that the District of Maryland has become one of the top-five[26] venues in the country for this kind of litigation. *See* Matthew Sag, "Copyright Trolling, An Empirical Study," (March 21, 2014). Iowa Law Review, Forthcoming, Link: http://ssrn.com/abstract=2404950) (accessed March 24, 2014) at Figure 5, p. 29.

These lawsuits, which target individual residents of this district with liability that can reach to $150,000 for a single movie, almost always cause severe financial and familial hardship, not to mention anxiety over the potential to be publicly embarrassed by being linked to a pornography case. As one commentator noted in the early days of file sharing infringement cases, such cases "weaken intellectual property norms by undermining the social, moral and legal legitimacy of intellectual property law." Opderbeck, D., "Peer-to-Peer Networks, Technological Evolution, and Intellectual Property Reverse Private Attorney General Litigation," 20 BERKELEY TECH. L.J. 1685 (2005) (arguing that procedural rules should be strictly enforced against the plaintiff in this kind of litigation).

---

[25] *See* Exhibit X, pp. 1–2 (email to Mr. Hoppe on contingency issue dated March 3, 2014).

[26] The District of Maryland trails only the Northern District of Illinois, the District of Colorado, the Eastern District of Pennsylvania; and the Middle District of Florida.

Between copying/sharing a movie that would retail for perhaps $9.99 (a charitable estimate), and a quasi-extortionate scheme whereby a pornography "trolling" outfit unabashedly uses the subpoena power of the federal courts to "plunder the citizenry,"[27] it seems clear which is the greater overall harm to the public interest. In short, the "public interest" *Shaffer* factor also weighs in favor of dismissal.

    (B)    *No Sanction Short Of Dismissal Would Do Justice Or Serve As An Effective Deterrent*

If Mr. Fieser and the data he swore he "personally extracted" using IPP's software are wholly excluded, it seems unlikely that this lawsuit could go forward, even if the Court were inclined to allow Malibu to try. According to the Fieser Decl, his observations are essentially the sole factual predicate upon which this and all other Malibu cases are foundationally supported; without Fieser's data from the IPP software, there is no case.

Of course, aside from the question of whether the lawsuit *could* go forward without Fieser and IPP, there is the additional question of whether it *should*. In order to protect the integrity of the judicial process, and to appropriately deter similar future misconduct both by Malibu and by similarly situated plaintiffs, nothing short of dismissal will suffice.

At the outset, it must be noted that when a party has been legitimately injured, dismissing his or her suit due to unethical arrangements made between his or her lawyer and an expert witness would indeed amount to a harsh result. Thus, the Fourth Circuit, in cases like *Shafffer*, and other circuits,[28] appropriately instruct district courts to use dismissal as a remedy of last resort.

---

[27] *Ingenuity 13, LLC v. John Doe*, 2013 U.S. Dist. LEXIS 64564 (C.D. Cal., May 6, 2013) (Case No. 12-cv-8333, ECF No. 130) at p. 2.

[28] *See, e.g., Eagle Hosp. Physicians, LLC*, 561 F.3d at 1307 (11th Cir.).

Here, by contrast, where the plaintiff is part of a sophisticated trolling operation, and there are nearly 2,000 lawsuits nationwide, 187 in this district alone at last count, dismissal of one or even a few dozen suits is no catastrophe for the plaintiff.  Instead, it would merely amount to a dip in second quarter revenues; little more than a speed bump on the road to BitTorrent infringement riches.  This kind of litigation is not really about righting a wrong, rather it is about a "systematic opportunism" that relies upon the federal courts as a channel to monetize pornographic content on an industrial scale. Matthew Sag, "Copyright Trolling, An Empirical  Study," (March 21, 2014). Iowa Law Review, Forthcoming, at p. 8 (noting that "[i]f anything unifies the patent law and copyright law experience of trolls, it is the sense that a troll is a systematic opportunist" and arguing for a conduct-based definition of trolling).

Indeed, as detailed in Section III(d), *infra*, Malibu is already in the process of swapping out IPP for another, less-tainted technical logging company.  Thus, even if all remaining suits based on data "personally extracted" by Fieser using IPP's "IPTRACKER" software, per the sworn Fieser Decl., are dismissed, these lawsuits will keep on coming from Malibu, based on data from the new provider.

In this context, it is only logical that the district court, which after all, has to supervise and manage all of these hundreds of cases on a day-to-day basis, should be afforded broader discretion to determine that dismissal is the only appropriate remedy.

Further, the dire need for an appropriate *deterrent* against the kind of champertous conduct presented here also weighs heavily in favor of dismissal.  From a systemic perspective, all signs suggest that this kind of litigation will only continue to continue to increase.  Currently, there is only a vanishingly small percentage of copyright owners engaged in what is sometimes called "end user" litigation; so this is an industry with tremendous potential for growth.  The Registrar of Copyrights recently acknowledged the need to update the copyright laws, which are showing their age, by starting

on the "Next Great Copyright Act," but it is unlikely that statutory damages will be changed anytime

soon. *See* Maria Pallante, "The Next Great Copyright Act," 36 COLUM. J. L & ARTS 315 (2013)[29]

(explaining that although the Copyright Act was passed in 1976, drafting it was a decades-long process

such that, substantively, it is really more a 1950's law than a 1970's law); *see also* Report of The

Register of Copyrights, "Copyright Small Claims," (September 2013).[30] Although the lure of rich

statutory damage awards is ultimately the engine driving this phenomenon, what really kicked this kind

of litigation into high gear was the advent of file sharing networks and the resulting economies of scale

available to a litigant intent on monetizing that kind of infringement. Thanks to these factors, a next-to-

worthless movie, with little if any intrinsic value, which is ubiquitously shared online, becomes worth

millions of dollars to a determined litigation cartel as the copyright-in-suit that can launch 1,000

complaints for infringement. Thus, the "nationwide blizzard of civil actions brought by purveyors of

pornographic films alleging copyright infringement by individuals utilizing . . . BitTorrent" is not likely

to abate anytime soon. *See In re BitTorrent Adult Film Copyright Infringement Cases*, 2012 U.S. Dist.

LEXIS 61447, 2012 WL 1570765 (E.D.N.Y. May 1, 2012) (E.D.N.Y. No. 11-3995).

　　　　In short, in safeguarding the integrity of the judicial process from the corrosive winds of

champerty and contingent fee witnesses, a clear deterrent message, in the form of outright dismissal,

should be sent that this kind of conduct will not be tolerated in this kind of case. *See Accrued Financial*

*II*, 298 F. 3d at 294–300; *Cf.* Fed. R. Civ. P. 11(c)(4) (appropriate sanctions limited to "what suffices to

deter repetition of the conduct or comparable conduct by others similarly situated"); *Zaczek*, 764 F.

Supp. at 1079; *Eagle Hosp. Physicians, LLC*, 561 F.3d at 1307; *Communist Party*, 351 U.S. at 124;

---

[29] Available at Copyright Office website: http://www.copyright.gov/docs/next_great_copyright_act.pdf

[30] Available at Copyright Office website: http://www.copyright.gov/docs/smallclaims/usco-smallcopyrightclaims.pdf

*Williamson*, 311 F.2d 441; *Dixon*, 394 F.2d 966; *see also* <u>*Perez v. Z Frank Oldsmobile, Inc.*</u>, 223 F.3d 617 (7th Cir. 2000) (Easterbrook, J.) (reviewing Nobel Prize literature on optimal deterrence, noting that fraudulent misconduct can often go undetected, and the "need to augment deterrence of concealable offenses is a principal justification of punitive damages.")

> (C)     *The Unusual Array Of Real Parties In Interest Behind These Suits Also Militates In Favor Of Dismissal*

Here, the "client's blameworthiness" <u>*Shaffer*</u> factor also favors dismissal.  This not because there are clear facts demonstrating that the ostensible client, Malibu Media, LLC, did something wrong; the direct culpability of Malibu's two owners in the apparent misconduct before this Court is largely unknown at present.  Based on facts adduced so far, it seems more likely that source of any deception and other culpable conduct here was Guardaley/IPP/Fieser itself, national plaintiff's counsel in Miami, and/or local counsel in Maryland.

The reason this factor nevertheless favors dismissal is that these likely culpable actors have in a sense, become the "client," by taking a contingent interest in the outcome of this litigation.  It may well be that Guardaley came up with this whole idea in the first place,[31] and that Guardaley/IPP and both tiers of lawyers have a greater total financial interest in the outcome of litigation than does Malibu itself.

Indeed, in response papers recently filed in Colorado, Malibu admits that the lawyers, rather than Malibu itself, apparently determine what defendants to sue,

> "Malibu's counsel culls through [the] infringement data received by IPP and sues 100-150 of the worst-of-the-worst infringers. To identify potential defendants, Malibu's counsel analyzes various things such as length of infringement, number of infringed works, and evidence of third party infringements the content of which can be used to

---

[31] *See* <u>Exhibit E</u> (email where Guardaley's founder Patrick Achache solicits German law firm to enter into trolling arrangement)

> identify a specific person. After using IPP's infringement data counsel sends it back as formatted declarations." <u>Exhibit Z</u>, p. 7, fn. 11.

Note that it is "Malibu's counsel" making these client decisions on initiating litigation, without any mention of approval or oversight by Mr. & Mrs. Field, who run Malibu Media, LLC.  *See id*.

In *Accrued Financial II*, the delegation of authority to file complaints to a professional promoter of lawsuits was one of the facts that the Fourth Circuit focused upon as a reason to invalidate the champertous assignments.  *Accrued Financial II*, 298 F.3d at 299–300 (the lawsuit "promoter" Accrued Financial "was given the power to mine lawsuits, promote them, and profit off of them without regard to the interests and desires of the injured party").  The Lipscomb Eisenberg & Baker firm may check in with Malibu's owners on occasion, but the foregoing admission makes clear who is really the driving force behind the "client" decisions in these lawsuits.

While Malibu may bear the label "client" based on the traditional definition of that word, the likely culpable actors in this situation are every bit as much the real parties in interest truly behind this litigation as is Malibu itself.

* * *

In sum, applying the *Shaffer* dismissal factors, multiple facts suggest a pattern of culpable conduct by the wrongdoer in this case.  Allowing key evidence to be collected by a contingent fee witness is prejudicial to Movant, to many others similarly situated, and to the administration of justice. These lawsuits are against the public interest, and the only appropriate remedy, given the nature of the "systematically opportunistic" pornographic infringement cartel bringing these cases, is dismissal.

**(d)      The Response Malibu Has Made So Far In Other Districts On The Contingent Fee Witness Problem Suggests Still More Obfuscation**

It seems that the contingent fee witness issue was raised with Malibu for the first time in the Northern District of Illinois on January 7, 2014, when defense attorney Jonathan Phillips filed a motion to compel further responses relating to Malibu's compensation to IPP. *Malibu Media, LLC v. John Doe*, N.D. Ill. No. 1:13-cv-6312, ECF No. 24, 1/7/14 (motion to compel).

Since then, Malibu has been forced, in a few jurisdictions outside of Maryland, to address the contingent fee witness issue. As far as Mr. Pietz is aware, Malibu's most recent response on the issue was filed in Colorado on March 20, 2014. *Malibu Media, LLC v. Benson*, D. Colo. No. 1:13-cv-2394, ECF No. 32, 3/20/14. A copy of that response is attached to the Pietz Decl. as <u>Exhibit Z</u>. The explanations Malibu has offered to date have raised more questions than they have answered.

(1)      <u>Apparently, Fieser's Sworn Assertion Here, That He Used IPP's "IPTRACKER"
Software To Collect The Data Underlying This Lawsuit, Was False</u>

The most startling revelation from Malibu's recent filings is that, contrary to the sworn assertions Malibu offered in support of its *ex parte* motions for early discovery here,[32] it is not IPP's "INTERNATIONAL IPTRACKER v 1.5" software that is being used by Mr. Fieser to collect the data after all. The new story is that the software being utilized by Fieser and IPP is not IPP's own software (which is really Guardaley's software, only under a different label) but rather new software provided by yet another German company, called Excipio GmbH. <u>Exhibit Z</u>, p. 9 (response to motion to exclude

---

[32] Fieser Decl, <u>Exhibit A</u>, ¶ 9 (Fieser used "INTERNATIONAL IPTRACKER v 1.5" to make his observations) and *id.* ¶ 15 (referring to "our software"); *see also* <u>Exhibit Q</u> (document filed by Fieser in *Malibu Media, LLC v. John Does 1-5*, S.D.N.Y. No. 12-cv-2954, ECF No. 7, 5/8/12 suggesting that "INTERNATIONAL IPTRACKER" software suite is IPP's software); *but see* Pietz Decl. ¶¶ 33–34 (explaining that the "INTERNATIONAL IPTRACKER" and "GUARDALEY OBSERVER" software suites are really same thing with different labels); *and* <u>Exhibit R</u> (purported expert in *Voltage* case (a plaintiff that previously used IPP as its expert) is confused about whether he used GUARDALEY OBSERVER v 1.2 or v 1.47 to log his data).

Fieser and IPP filed in Colorado, where Malibu states that "Excipio contracts with IPP to provide IPP with the data collection system that IPP uses to detect infringement of Malibu's works. [FN 12]"). Malibu makes a half-hearted attempt to further explain the purported software switchover with this confounding footnote,

> "IPP used to maintain and operate and use its own system. At some time unknown to Malibu, but well in advance of any of the infringement that was logged in this case, IPP entered into a license agreement with Excipio to use its system. The two companies now both compete with each other and are licensor-licensee. Under this arrangement, IPP licenses the use of Excipio's system and servers. Patzer, at ¶ 3. IPP adds value and distinguishes itself by, inter alia, customer specific analysis tools and its client service."

Obviously, this begs the question, if Malibu is unaware of when the switchover was made, how does it know it occurred "well in advance of the infringement that was logged in [that] case"? When, *exactly*, was the switch made from IPP/Guardaley's system to Excipio's system?

Same thing with what firm was hosing the server that did the actual data collection, and who maintained the chain of custody; the Fieser Decl. says something completely different than what Malibu is now saying *really* happened.

When seeking early discovery, Malibu told the court here that the IP address being logged supposedly "connected to **IPP's** investigative server." Fieser Decl., Exhibit A, ¶ 13 (emphasis added). Now, the story is that "IPP licenses the use of **Excipio's systems and servers**." Exhibit Z, p. 22.

Similarly, what Malibu told the Court here is that **Fieser** "monitored the network" and "identified the IP address," in question; (Fieser Decl., Exhibit A, ¶ 6); **he** was tasked by IPP with "effectuating, analyzing, reviewing and attesting to the results of this investigation" (*id.* at ¶ 8); **he** "personally extracted the resulting data emanating from the investigation" (*id.* at ¶ 11); **he** "reviewed the evidence logs, [and] isolated the transactions and the IP addresses being used on [] BitTorrent" (*id.* at ¶ 12); and **"IPP** reviews each Movie side-by-side with the corresponding digital media file" (*id.* at ¶ 15).

Since the IPP contingency fee issue was first raised in January, the new story is that "Malibu will not use Mr. Fieser [to testify that the data files contain evidence proving infringement] because he will not be able to establish the chain of custody to the PCAP. To explain, Mr. Patzer, not Mr. Fieser, restores the PCAPs saved onto the WORM tape drives and makes forensically sound copies of them for use at trial. Thus, only Mr. Patzer can testify to the chain of custody . . . . Michael Patzer works as an independent contractor predominantly for Excipio GmbH, a German company." Exhibit Z, p. 8.

All this brings to mind a jockey attempting to switch horses mid-race. The problem is though that bets were made on the first horse, in the form of sworn *ex parte* declarations attesting to one set of facts, back when the field left the gate. *See* Fieser Decl., Exhibit A, ¶ 9. Maybe Malibu did switch from IPP/Guardaley to Excpio but, if so, that does ***not*** square with what Malibu represented to the Court here when it moved for early discovery. *Id.* It is probably no coincidence that all of a sudden, since January, when IPP's contingency problem was brought to light, Michael Patzer and Excipio are now much more involved in providing evidence to Malibu. Changing the arrangement now does not cure the prejudice. *See* Straughter, 2011 U.S. Dist. LEXIS 53195, at *12 (holding contingent fee witness are excluded *per se* and, "[t]hat plaintiff and [the expert] Dr. Keyes recently cancelled their contingency fee arrangement does not change the analysis.")

A clean way to segregate out the cases tainted by the IPP contingency fee arrangements, but still allow Malibu to continue to seek relief for infringement, would be to dismiss any case where Malibu sought and obtained early discovery based on the present form of the apparently incorrect (if not perjurious) Fieser Decl. (Exhibit A). Malibu can start over filing new cases, provided that they *accurately* disclose the nature of the Excipio software that is really being used (and, perhaps, the

pecuniary interest of all individuals and companies with a stake in the outcome of the case) when they apply for early discovery.

> (2)    Malibu's Assertion The "Proprietary" System Used To Log IP Addresses Is "Not Capable Of Being Manipulated" Is Facially Ridiculous

Much of Malibu's response on the contingency fee issue amounts to an attempt to dazzle the Court with an impressive array of technical jargon supported by citations to Wikipedia articles.[33] *See* Exhibit Z.  Boiling it down, the main thrust of Malibu's argument is this: the primary factual support for these lawsuits consists of  "computer records," which supposedly speak for themselves, and which are supposedly "incapable of being manipulated or altered." *Id.*, p. 1. Then, in describing how the data collection system is setup to generate these "computer records" works, Malibu uses the word "proprietary" to describe four of the eight steps. *Id.*, pp. 2–3.[34]  That Malibu cannot see how a "proprietary" software system and related methodology could possibly be subject to manipulation is somewhat astounding.

Simply, the computer system being used is a black box, and Malibu has fought like the dickens any attempts by defendants to peer inside.  Malibu is currently defending an Order to Show Cause ("**OSC**") re: contempt for refusing to disclose the source code for IPP/Guardaley/Excipio's software in the Northern District of Illinois.  *See Malibu Media, LLC v. John Doe*, N.D. Ill. No. 1:13-cv-6312, ECF No. 54, 3/21/15 (outlining a history that includes the granting of one motion to compel so far,

---

[33] *See Malibu Media, LLC v. Benson*, D. Colo. No. 1:13-cv-02394, ECF No. 32, 03/20/14 at Exhibits D, E, F, and H thereto, with honorable mention to Exhibits A, B, which are printouts from Wikipedia-like websites, about "hash" values.

[34] According to Malibu, the "proprietary BitTorrent client" being used to actually log the infringements "is not commercially available and its code is a trade secret." *Id.* at. p. 2, fn.3.  Similarly, a "proprietary program" is used for "checking the MySQL log files," and yet another "proprietary program" is used to "check the information contained in an Excel spreadsheet." *Id.* at pp. 2–3.

two court hearings, and one "accidental" nondisclosure of the software); *see also id*. at ECF No. 48, 3/14/14 (Malibu's response brief arguing that "Plaintiff is not in possession, custody, or control of Excipio's proprietary software. Therefore, Plaintiff cannot be sanctioned[35] for failing to turn it over").

Malibu asserts that "Hash values are more reliable than DNA evidence."  Exhibit Z, p. 2. Whether that is true or not, Malibu would have to admit that if all the technicians down at the DNA lab were being paid a sizeable annual bonus by the prosecutor's office based on the number of convictions their work brings in, that would be a problem.  It would prejudice the judicial process, and all defendants, *per se*. As any lawyer knows, technical data and evidence is really only as reliable as the systems put in place and the people who collect it.  Here, given both the champertous contingent fee arrangement and Guardaley's sordid history, there is substantial reason to doubt both the methods and the people behind this black box "proprietary" logging system.

## IV.  CONCLUSION

If Malibu and its lawyers want to file nearly 2,000 federal lawsuits nationwide, is it really too much to ask that their key witness, on whose data each case is foundationally supported, not be paid on a contingent fee basis?  The Fourth Circuit, with help from Judge Motz, has already provided the answer in *Accrued Financial II*, 298 F. 3d at 294–300.  Little wonder then that Malibu hit the eject button on the 3024 Action rather than risk having Judge Motz scrutinize that very issue again in this new context.

If Malibu and its lawyers want to make a business out of seeking *ex parte* relief from the federal courts isn't it appropriate to require them to comply with their duty of candor, which is heightened in *ex*

---

[35] Neither can Excipio be held in contempt directly for failing to turn over its code.  Conveniently for Malibu, since Guardaley/IPP and Excipio are German companies, they are arguably beyond the reach of a pre-suit turnover order issued by a U.S. court, because Germany filed a reservation under Art. XXIII of the Hague Evidence Convention that refuses execution of letters of request pertaining to US pretrial discovery of documents.

*parte* proceedings?  That affirmative commands from the Fourth Circuit, "Maryland's strong public policy" against stirring up lawsuits that primarily benefit the promoter, various ethical rules, common law principles, and perhaps even the federal anti-gratuity statute have been violated here seems clear. *See id*. The only remaining question is what to do about it.

For all of the reasons explained in detail in this motion, the only appropriate remedy, *given the unique circumstances of this type of "systematically opportunistic" litigation,* is dismissal.  At least according to the sworn assertions made in the Fieser Decl., without Fieser and IPP, there is no case. Further, Malibu has already shown that it cares so little about the result of any single lawsuit that it would prefer to unilaterally dismiss a case rather than risk litigating against a defendant raising the right issues.  As Judge Gibney acknowledged, such tactics "indicate an improper purpose for the suits."  *See K-Beech, Inc.*, 2011 U.S. Dist. LEXIS 124581, *6-7.

Nor should the Court pay any heed to Malibu's attempt to switch horses mid-race.  The revisionist history Malibu has offered in Colorado--that it wasn't IPP/Gardaley servers and software overseen by Tobias Fieser; really, it was Excipio servers and software overseen by Michael Patzer--at best counts as yet another instance of misleading the Court and defendants about the suspicious German computer firms involved in this litigation.  The record suggests that Malibu, like Prenda before it, simply will not be candid about who is really behind these lawsuits.

Accordingly, it is respectfully requested that Malibu be ordered to show cause as to why all evidence from Tobias Fieser and IPP should not be precluded, and these cases dismissed.  In addition to addressing the legal arguments made here, Malibu should also address the factual issues identified in the Introduction & Summary of this motion.

Respectfully submitted,

DATED: March 28, 2014

| | |
|---|---|
| **THE PIETZ LAW FIRM** | **JOHN C. LOWE PC** |
| */s/ Morgan E. Pietz* | */s/ John C. Lowe* |
| Morgan E. Pietz (Cal. Bar No. 260629)* | John C. Lowe (Md. Bar No. 12409) |
| 3770 Highland Avenue, Suite 206 | 5920 Searl Terrace |
| Manhattan Beach, CA 90266 | Bethesda, MD 20816 |
| mpietz@pietzlawfirm.com | johnlowe@johnlowepc.com |
| Telephone:   (310) 424-5557 | Telephone:   (202) 251-0437 |
| Facsimile:   (310) 546-5301 | Facsimile:   (301) 320-8878 |
| *Application for Admission Pro Hac Vice Pending* | *Local Counsel* |

Attorneys For Putative John Does Identified On The Caption

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing paper with the Clerk of the Court using ECF, which will send notification of such filing to all attorneys of record.

*/s/ John C. Lowe*
John C. Lowe
DATED:      March 28, 2014