## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **MALIBU MEDIA, LLC,** | * | **CASE NO. 1:14-cv-0223-MJG** |
| **Plaintiff,** | * | **Assigned to: Honorable Marvin J. Garbis** |
| | | **United States District Judge** |
| **v.** | * | |
| **JOHN DOE subscriber assigned IP address 173.64.119.92,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| **MALIBU MEDIA, LLC,** | * | **CASE NO. 1:14-cv-0257-CCB** |
| **Plaintiff,** | * | **Assigned to: Honorable Catherine C. Blake** |
| | | **United States District Judge** |
| **v.** | * | |
| **JOHN DOE subscriber assigned IP address 71.200.143.209,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| **MALIBU MEDIA, LLC,** | * | **CASE NO. 1:14-cv-00263-RDB** |
| **Plaintiff,** | * | **Assigned to: Honorable Richard D. Bennett** |
| | | **United States District Judge** |
| **v.** | * | |
| **JOHN DOE subscriber assigned IP address 76.100.228.15,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO ISP SUBSCRIBER'S MOTION FOR AN ORDER TO SHOW CAUSE AS TO WHY ALL EVIDENCE AND DATA FROM TOBIAS FIESER AND HIS COMPANY IPP SHOULD NOT BE PRECLUDED AND THESE CASES DISMISSED [CM/ECF 9]

## <u>**TABLE OF CONTENTS**</u>

I.   NTRODUCTION ....................................................................................................... 5

II.  FACTUAL BACKGROUND...................................................................................... 5

  A.  The Data Evidencing The Infringement Is *Not* Capable of Being Manipulated By Humans
    5

    1.  A Very Short Explanation of How BitTorrent Works .................................... 6

    2.  A 10,000 Foot Overview of the Data Collection System Used By IPP ........... 6

    3.  The Evidence Produced By the Data Collection System Is Independently Verifiable .... 7

      a.  PCAP Computer Files Are Independently Variable..................................... 7

        (i)  Anyone Who Downloads TCPDump – For Free – Can Review and Verify the Infringing Transaction.................................................... 7

      b.  Every Entry Onto the MySQL Server Log File Correlates To a PCAP ...................... 8

    4.  The PCAP and Log Files Are Saved on an Uneditable WORM ("Write Once Read Many") Tape Drive ................................................................. 8

  B.  A Short Summary of Mr. Fieser's Possible Testimony.................................... 10

    1.  Mr. Fieser Does Not Need to Testify That the Computer Files Transmitted Via BitTorrent Are Copies Because Anyone Can Do That.................................. 11

    2.  Mr. Fieser is Not the Witness Malibu Will Call to Authenticate the Infringement Data at Trial or to Lay the Foundation For its Introduction...................................... 11

  C.  A Very Short Explanation of Michael Patzer's Anticipated Testimony ........................ 12

  D.  Patrick Paige Tested the Data Collection System ............................................ 13

  E.  Judge Baylson Found the Data Collection System Was Valid ......................... 13

  F.  Movant Can Retain An Expert to Test the Data Collection System ................. 13

  G.  Malibu and IPP Have a Written Fixed Fee Agreement.................................... 14

  H.  Movant's Counsel's Presentation of the Facts is Misleading and Inaccurate ................... 14

  I.  Movant's Assertion That "IPP is Simply Guardaley With a New Name" is Wrong ......... 16

  J.  The Software Used to Detect the Infringement in This Case Is Not the Same as the Software That Was the Subject of the Decision by the State Court of Berlin .................. 17

  K.  The Declaration of Tobias Fieser is Not False ................................................ 17

III.  ARGUMENT.......................................................................................................... 19

  A.  Malibu is Permitted to Pay For Data Collection Services................................ 19

  B.  No Witness Has Ever Been Paid For Testimony Much Less on a Contingent Basis......... 20

C.   The Northern District of Illinois Recently Denied a Motion Nearly Identical to Movant's Motion in a Malibu Media Case ........................................................................................ 21

D.   Even if Malibu Had Paid a Witness on a Contingency That Witness's Testimony Should Not be Excluded ........................................................................................................... 22

E.   Malibu Did Not Violate the Federal Anti-Gratuity Statute But Even if it Had That Would Not Be a Basis For Excluding Evidence or Testimony ......................................................... 24

F.   Malibu's Motion for Leave Did Not Violate Maryland Rule of Professional Conduct 3.3(d) ........................................................................................................................... 25

G.   The Cases Which Movant Relies on Are Distinguishable ................................................. 26

    1.   The Accrued Cases Are Not On Point ................................................................. 26

    2.   Farmer v. Ramsey Is Not On Point ..................................................................... 29

H.   Plaintiff Was Not Forum Shopping When It Dismissed Its Case ...................................... 30

I.   Sanctioning Plaintiff By Dismissing Its Cases Is Improper And Unwarranted ................. 31

IV.   CONCLUSION ........................................................................................................... 34

## TABLE OF AUTHORITIES

*Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 296 (4th Cir. 2002)...................... 27

*Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, CIV.JFM-99-2573, 2000 WL 976800 (D. Md. June 19, 2000) *aff'd*, 298 F.3d 291 (4th Cir. 2002) ................... 26

*Am. Hotel Mgmt. Associates, Inc. v. Jones*, 768 F.2d 562, 570-71 (4th Cir. 1985)..................... 27

*Armenian Assembly of Am., Inc. v. Cafesjian*, 924 F. Supp. 2d 183, 194 (D.D.C. 2013) ............ 20

*Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 679 (D. Kan. 2000) ................... 20

*Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 681 (D. Kan. 2000) ................... 24

*Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001) ....................................... 29

*Glynn v. EDO Corp.*, 2010 WL 3294347 (D. Md. Aug. 20, 2010) ................................. 34

*Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516, 1524 (S.D. Fla. 1994) .................................. 24

*Gorrell v. Huffman*, 5:11CV44, 2011 WL 2065292 (N.D.W. Va. May 25, 2011)...................... 30

*Hare v. McGue*, 178 Cal. 740, 742, 174 P. 663, 664 (1918) ........................................ 20

*Hoffa v. United States*, 385 U.S. 293, 311, 87 S. Ct. 408, 418, 17 L. Ed. 2d 374 (1966) ........... 23

*Malibu Media v. Jeremiah Benson*, 13-cv-02395 (D. Colo.)........................................ 31

*Malibu Media v. John Doe*, 8:13-cv-03024-JFM, (D. Md.) ....................................... 30

*Malibu Media v. Kelley Tashiro*, 13-cv-00205 (S.D. In.)........................................ 31

*Malibu Media, LLC v. Doe*, 1:13-cv-00893-RJJ, CM/ECF 15, at p. 2 (W.D. Mich. October 28, 2013)........................................ 26

*Malibu Media, LLC v. Doe*, 13 C 8484, 2014 WL 1228383 (N.D. Ill. Mar. 24, 2014).... 21, 22, 26

*Nu Image, Inc. v. Does 1-26*, 2:12-cv-04753, (E.D. Pa. August 20, 2012); *Nu Image, Inc. v. Does 1-91*, 4:12-cv-00331 (N.D. Fla. July 9, 2012) ............................... 16

*Nu Image, Inc. v. Does 1-3,932*, 2012 WL 1900165, at *7 (M.D. Fla. 2012) ...................... 16

*People v. McNeill*, 316 Ill. App. 3d 304, 306, 736 N.E.2d 703, 705 (Ill. App. Ct. 2000) ........... 21

*Perry v. New Hampshire*, 132 S. Ct. 716, 728, 181 L. Ed. 2d 694 (2012) ........................ 23

*Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao Exportacao Ltda*, 2010 WL 625356 (S.D. Fla. 2010)........................................ 20

*Schackow v. Med.-Legal Consulting Serv., Inc.*, 46 Md. App. 179, 196, 416 A.2d 1303, 1313 (1980) ........................................ 20, 21

*U.S. v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987) .................................. 22

*United States v. Dawson*, 425 F.3d 389, 394 (7th Cir. 2005) ..................................... 24

*United States v. Holloman*, 238 F.3d 416 (4th Cir. 2000) ........................................ 23

*United States v. Levenite*, 277 F.3d 454, 461 (4th Cir. 2002)...................................... 23

*United States v. Shaffer Equip. Co.*, 11 F.3d 450 (4th Cir. 1993) ................................ 31, 34

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO ISP SUBSCRIBER'S MOTION FOR AN ORDER TO SHOW CAUSE AS TO WHY ALL EVIDENCE AND DATA FROM TOBIAS FIESER AND HIS COMPANY IPP SHOULD NOT BE PRECLUDED AND THESE CASES DISMISSED [CM/ECF 9]**

## I.   NTRODUCTION

Movant's Motion for an Order to Show Cause As to Why All Evidence and Data From Tobias Fieser and His Company IPP Should Not Be Precluded and These Cases Dismissed (CM/ECF 9) ("the Motion") correctly asserts that Malibu Media, LLC ("Malibu") paid IPP International UG ("IPP"), for its data collection services.  From these facts, Movant erroneously argues that the physical evidence obtained by IPP is inadmissible and that IPP's employee should be precluded from testifying.  While not titled as such, it is a Motion *in Limine* seeking to exclude relevant evidence and testimony.  Paying a service provider to record a computer transaction is not a basis under the Federal Rules of Evidence to exclude relevant evidence and testimony, nor dismiss Plaintiff's case.

## II.   FACTUAL BACKGROUND

### A.   The Data Evidencing The Infringement Is *Not* Capable of Being Manipulated By Humans

Movant's entire argument is premised on the possibility of witness bias based upon Malibu's payment for IPP's services.  As explained below, the evidence that Malibu uses for purposes of proving infringement occurred is *recorded* in such way that it is *not* capable of being manipulated or altered.  Humans play no part in the creation or storage of the evidence. Significantly, the evidence can be independently verified by anyone – including Movant. Indeed, in preparation of this response, Plaintiff independently verified that the evidence is correct.  Consequently, there is no possibility of biased testimony.  The fact section explains why this paragraph is true.

1.   A Very Short Explanation of How BitTorrent Works

To understand the evidence upon which Plaintiff relies, there are two important things to address about the way BitTorrent works: (a) peers in a BitTorrent swarm connect to each other's computers in order to transmit "pieces" of a computer file (here, the computer files transmitted contain copies of Plaintiff's works); and (b) every "piece" of the computer file – and the entire computer file – being transmitted via BitTorrent has its own *unique* hash value.   Hash values are digital fingerprints for pieces of data.[1]   Hash values are more reliable than DNA evidence.   *See* FN1.  A hash value is calculated.   Regardless of who calculates the hash value of any certain piece of data, the hash value for that certain piece of data will always be the same.[2]

2.   A 10,000 Foot Overview of the Data Collection System Used By IPP

The data collection system used by IPP has numerous components.   It contains, *inter alia*: (1) a proprietary BitTorrent Client[3]; (2) servers running a MySQL database which log verified infringing transactions; (3) packet analyzers, also known as packet sniffers, which create and analyze PCAPs; (4) servers that run the proprietary BitTorrent Client and record PCAPs; (5) WORM ("Write Once Read Many") tape drives for storing the PCAPs and MySQL server data; (6) a program to synchronize the servers' clocks with both a GPS clock and an atom clock[4]; (7) a proprietary program for checking the MySQL log files against the contents of the PCAPs; and (8) a proprietary program which checks the information contained in an Excel Spreadsheet

---

[1] See Exhibit A, citing numerous district and appellate court decisions describing hash values and finding that they are reliable unique identifiers for data akin to digital fingerprints.

[2] *See* Composite Exhibit B, which is an article explaining that hash values can be calculated and websites advertising commercially available free hash calculators.

[3] In other words, a software program that enables the BitTorrent protocol to work.  The BitTorrent Client used by Excipio is not commercially available and its code is a trade secret.  Patzer, at ¶ 6.  It was written to overcome the unique challenges of entering into a massive number of BitTorrent transactions with a massive number of people without distributing data.  *Id.*, at ¶ 7.

[4] If the servers are not synchronized with both the GPS clock and atom clock to within one hundredth of a second the infringing transaction is not logged but instead disregarded.  Patzer, at ¶ 8.

against what is in the PCAPs and server's log files.  *See* Patzer Declaration, at ¶ 5, Exhibit K; and Exhibit C, Mr. Fieser's testimony during the Bellwether Trial transcript at p. 100.

> 3.  The Evidence Produced By the Data Collection System Is Independently Verifiable

The *evidence* that the data collection system produces is comprised of PCAP computer files and MySQL server log files.  Each entry on the MySQL log file correlates to a specific PCAP file.  Patzer, at ¶ 9.

> a.  PCAP Computer Files Are Independently Variable

Data sent through the internet is delivered in the form of "packets" of information.[5] PCAP stands for "Packet Capture."  A PCAP is a computer file containing captured or recorded data being transmitted between two computers.[6]  A "Packet Analyzer" records packets of data being transmitted between two computers over a network, such as the internet, and saves it in a computer file called a PCAP.[7]  Packet analyzers also enable users to read and analyze PCAPs. IPP's data collection system uses a proprietary packet analyzer *and* TCPDump to record the *entire* infringing transaction.  TCPDump is an open source free packet analyzer.[8]

> (i)  Anyone Who Downloads TCPDump – For Free – Can Review and Verify the Infringing Transaction

*Anyone* who downloads TCPDump – for free – can review and verify the entire transmission of a piece of Malibu's copyrighted work from Movant's IP address.   The proof of infringement is a PCAP *recording* of Movant's IP Address *sending* a piece of the copyrighted work to the MySQL server.  The PCAP recording speaks for itself.  Testimony about what is contained in the PCAP can be elicited at trial by either IPP's employee, Mr. Fieser, Malibu's

---

[5] *See* Exhibit D, Wikipedia Article on "Internet Protocol," at paragraph 2.
[6] *See* Exhibit E, Wikipedia Article on "PCAP."
[7] *See* Exhibit F, Wikipedia Article on "Packet Analyzer."
[8] http://www.tcpdump.org/#

computer forensic expert Mr. Patrick Paige, Excipio's independent contractor, Mr. Michael Patzer, or via a demonstration during trial by any other witness. The demonstration would merely require the witness to install TCPDump so that he or she could read and analyze the PCAP. Here, in preparation of its response to this motion, Plaintiff's attorneys asked Michael Patzer, an individual who does not work for IPP, to examine the evidence, without compensation. Mr. Patzer independently reviewed the PCAPs in this case and confirmed that the PCAPS recorded Movant's IP address infringing Plaintiff's copyrighted works at the exact Hit Dates and UTC times listed on Exhibit A to Plaintiff's Complaint. Patzer, at ¶ 13.

### b. Every Entry Onto the MySQL Server Log File Correlates To a PCAP

Movant sent the investigative server numerous "pieces" of each one of the computer files that contain a copy of Malibu's works. Accordingly, TCPDump recorded numerous BitTorrent transactions for each infringing computer file. Each one of these transactions was logged in a MySQL log file *and* fully recorded as a PCAP. Significantly, every entry on the MySQL server log file correlates to a specific PCAP. Patzer, at ¶ 9. Both the MySQL log file and the PCAP are computer records.

### 4. The PCAP and Log Files Are Saved on an Uneditable WORM ("Write Once Read Many") Tape Drive

"Write once read many (WORM) describes a data storage device in which information, once written, cannot be modified. This write protection affords the assurance that the data cannot be tampered with once it is written to the device."[9] Both the PCAPs and log files are saved onto WORM tape drives. Patzer, at ¶ 10. There is no possibility that the information on these WORM drives can be edited. *Id.,* at ¶ 11. Further, each of the WORM tape drives is

---

[9] *See* Exhibit H, Wikipedia article entitled "Write once read many."

electronically stamped with a German government issued time stamp at least every twenty four hours.  *Id.,* at ¶ 12.



B.      A Short Summary of Mr. Fieser's Possible Testimony

Mr. Fieser is the only employee of IPP who *may* testify.  His testimony is unnecessary. Therefore, Malibu will *not* likely call Mr. Fieser.  What follows is a short summary of what Mr. Fieser would say if Malibu calls him.

Tobias Fieser is a salaried employee of IPP.  Fieser Declaration, at ¶ 4, Exhibit L.  He does not have an ownership interest in IPP nor any other entity involved in or affiliated with IPP's data collection system.  *Id.*, at ¶ 6.  Mr. Fieser is not being paid for his testimony and does not have the right to receive any portion of a settlement or judgment in Plaintiff's favor.[10]  *Id.*, at ¶ 7.

Mr. Fieser has three primary functions at IPP: (1) verify that the BitTorrent computer files as evidenced by their unique hash values are copies of the original works; (2) extract the MySQL server data and make it available to IPP's clients, here Malibu's counsel; and (3) upload a declaration prepared by IPP's clients' counsel (in this case Malibu's attorney) into a computer program and sign a declaration if a green light appears.[11]  *See* Exhibit C, Mr. Fieser's testimony during the Bellwether Trial transcript at pp. 92, 100.  The computer program verifies the attested to infringement data is contained in the servers' MySQL log files.  This ensures it has not been altered by counsel during the suit formation process.  *Id.*

---

[10] Malibu would reimburse IPP for Mr. Fieser's travel and lodging costs and pay IPP a reasonable flat daily rate fee for Mr. Fieser's time away from work.

[11] Each month approximately 80,000 U.S. citizens infringe Malibu's copyrighted works.  Malibu's counsel culls through this infringement data received by IPP and sues 100-150 of the worst-of-the-worst infringers.  To identify potential defendants, Malibu's counsel analyzes various things such as length of infringement, number of infringed works, and evidence of third party infringements the content of which can be used to identify a specific person.  After using IPP's infringement data counsel sends it back as formatted declarations.

1. Mr. Fieser Does Not Need to Testify That the Computer Files Transmitted Via BitTorrent Are Copies Because Anyone Can Do That

Mr. Fieser does not need to testify that the computer files transmitted via BitTorrent are copies of Malibu's movies. To explain, the computer files have *unique* cryptographic hash values and are playable movie files. Accordingly, anyone can watch the BitTorrent computer file copy and compare it to the original for purposes of ascertaining whether it is a copy. For this reason, in all other recent matters around the country which have approached trial, opposing counsel has stipulated that the computer files contain copies. If opposing counsel will not so stipulate then Malibu will ask this Court to take judicial notice. Judicial notice is appropriate under rule Fed. R. Evid. 201(b) because it is "a fact that is not subject to reasonable dispute [and] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." A stipulation or judicial notice is particularly appropriate because the movies contain adult content. Consequently, it may be uncomfortable or distracting for jurors to watch them. Nevertheless, in the absence of a stipulation or judicial notice, Malibu could have Patrick Paige, its expert witness, Plaintiff's principle, or Mr. Patzer calculate the hash values of the subject computer files at or before trial and play the copy and original in a split screen. This proves A is a copy of B.

2. Mr. Fieser is Not the Witness Malibu Will Call to Authenticate the Infringement Data at Trial or to Lay the Foundation For its Introduction

At trial, Malibu will call Mr. Patzer to testify that the PCAPs and MySQL log files contain evidence that proves that an infringement was committed by a person using Movant's IP Address. Malibu will not use Mr. Fieser for this purpose because he will not be able to establish the chain of custody to the PCAP. To explain, Mr. Patzer, not Mr. Fieser, restores the PCAPs

saved onto the WORM tape drives and makes forensically sound copies of them for use at trial. Thus, only Mr. Patzer can testify to the chain of custody.

C.   A Very Short Explanation of Michael Patzer's Anticipated Testimony

Michael Patzer works as an independent contractor predominantly for Excipio GmbH, a German company.  Patzer, at ¶ 2.  Excipio contracts with IPP to provide IPP with the data collection system that IPP uses to detect infringement of Malibu's works.[12]  *Id.*, at ¶ 4.  Mr. Patzer designed, implemented, maintains and monitors the data collection system that Excipio both owns and uses to identify the IP addresses used by people to commit copyright infringement via the BitTorrent protocol.  *Id.*, at ¶ 3.  *See also* Exhibit I, Mr. Patzer's testimony during the Bellwether Trial transcript at p. 54.  No one at Excipio has an ownership in IPP or vice versa. *Id.*, at ¶ 14.  Mr. Patzer does not have an ownership interest in Excipio.  *Id.,* at ¶ 15.  He is not paid for his testimony and is not entitled to any portion of any money received from a settlement or judgment in Malibu's favor.[13]  *Id.,* at ¶ 16.  Malibu has never paid Excipio or Mr. Patzer anything.  *Id.,* at ¶ 16.

Mr. Patzer will answer all of the questions necessary to lay the foundation for the introduction into evidence of the PCAP and MySQL log files as business records within the meaning of Fed. R. Evid. 803(6).  Further, he will answer all of the questions necessary to authenticate the PCAP and MySQL log files pursuant to Fed. R. Evid. 901(a).  Finally, Mr. Patzer will testify that the PCAPs are recordings of computer transactions during which a person

---

[12] IPP used to maintain and operate and use its own system.  At some time in 2011, well in advance of any of the infringement that was logged in this case, IPP entered into a license agreement with Excipio to use its system.  The two companies now both compete with each other and are licensor-licensee. Under this arrangement, IPP licenses the use of Excipio's system and servers.  Patzer, at ¶ 3.  IPP adds value and distinguishes itself by, *inter alia*, customer specific analysis tools and its client service.

[13] Malibu does intend to reimburse Excipio for Mr. Patzer's travel and lodging cost and pay a reasonable flat daily rate fee for Mr. Patzer's time away from work.

using IP Address 76.25.62.43 sent pieces of the infringing computer files to the servers that he personally maintains and monitors.

D.     Patrick Paige Tested the Data Collection System

Malibu's computer forensic expert, Patrick Paige, tested the data collection system.  His report is attached as Exhibit J.  His test involved seeding public domain movies, i.e. movies that are not protected by copyright.  *See* Exhibit J.  He gave IPP the titles of the works.  *Id.*  IPP, using Excipio's system, found the works and entered into BitTorrent transactions with Mr. Paige's test servers.  *Id.*  Mr. Paige used a packet analyzer on his test servers to record all of the transactions in PCAPs.  *Id.*  He compared the PCAPs he recorded during the transactions with the PCAPs that were recorded by IPP using Excipio's system.  *Id.*  They matched perfectly.  *Id.* This could not happen unless Excipio's system accurately created PCAPs of transactions.  *Id.*

E.     Judge Baylson Found the Data Collection System Was Valid

Judge Baylson presided over the Bellwether trial wherein Malibu was the first ever Plaintiff to try a BitTorrent copyright infringement case.  At the trial, Judge Baylson had an independent court appointed computer expert in attendance.  After the trial, Judge Baylson found that IPP's data collection system "is valid."  *See Malibu Media, LLC v. John Does 1, 6, 13, 14*, 950 F. Supp. 2d 779, 782 (E.D. Pa. 2013) ("Malibu [] expended considerable effort and expense to determine the IP addresses of the infringing parties, and the technology employed by its consultants . . . was valid.")

F.     Movant Can Retain An Expert to Test the Data Collection System

Movant has the right to hire an expert to test the data collection system.  Movant has chosen instead to attack the data collection system based upon unfounded speculation about the potential for biased testimony.  Movant's attack does not specify how the system may be flawed

or how testimony that merely reads computer records can be biased.  This is no surprise because there is no possibility for biased testimony.  In a similar case, Excipio has offered to produce its software to the defendant for testing, provided that the defendant do so under a mutually agreed upon protective order.  *See Malibu Media, LLC v. Doe*, 13 C 6312, 2014 WL 1365508 (N.D. Ill. Apr. 7, 2014) ("Excipio states that it is 'willing to produce a copy of the requested source code as long as the source code will be adequately protected.'")

G.   Malibu and IPP Have a Written Fixed Fee Agreement

Malibu and IPP have a written fixed fee agreement pursuant to which Malibu pays IPP for providing the service of collecting data about infringements.  Exhibit G, Field, at ¶ 8.  IPP has not been paid anything for this case.  Exhibit L, Fieser, at ¶ 10.  Malibu's prior oral agreement with IPP to pay IPP a small portion of the amount received from a settlement or judgment from Malibu's litigation does not apply to this case.  Field, at ¶ 7.  Malibu has never paid *any* fact witness to testify in this case or any other case.  *Id.*, at ¶ 9.[14]

H.   Movant's Counsel's Presentation of the Facts is Misleading and Inaccurate

Movant, relying on the improper declaration of his or her counsel, presents a skewed version of facts regarding Guardaley and its lawsuit in Germany.  First, Movant asserts that Guardaley is a "[discredited] forensic BitTorrent monitoring firm," who was "caught by another technology company in Germany using unreliable methods and a 'falsified bit field' to lure infringers."  Movant's Motion, p. 17; Pietz Declaration, p. 6.  Movant further asserts that "the state court of Berlin found the allegations that Guardaley's software was unreliable to be truthful."  Pietz Declaration, p. 9.

As presented, Movant's recitation of the facts is misleading.  Specifically, the Guardaley lawsuit was brought based upon an unfair competition claim.  Guardaley alleged that the

---

[14] Malibu pays Mr. Paige, an expert, an hourly rate to prepare for and appear at legal proceedings.

defendant had made particular harmful statements to third parties, including that it had stolen the software that it used to detect infringement and that it provides "unreliable investigative services." *See* Movant's Exhibit F, p. 16.  Guardaley was granted an injunction against the defendant which was appealed to the State Court of Berlin.  On appeal, the Berlin Court found with regard to the statement that Guardaley provided unreliable investigative services, that enough "credibly demonstrated facts permit the *assumption* that the statement in dispute is true." *See* Movant's Exhibit J, at p. 12 (emphasis added).  Therefore, Guardaley did not "have a claim against the Respondents for injunctive relief under §§ 8(1), 3(1), 4 No. 8 [of the] Unfair Competition Law[,]" and the Court abrogated the injunction as it pertained to that claim.  Movant's Exhibit J, p. 11.  Significantly, the Berlin Court did *not* find *as a matter of fact* that Guardaley's software was unreliable but instead, only found that the defendant had alleged sufficient factual matter to satisfy the "demonstrably true" element of an unfair competition claim under the German Act.[15]  As such, the injunction could not survive because defendant sufficiently supported the "assumption" that the harmful statement made was true and therefore no violation of the German Act Against Unfair Competition existed.

Additionally, contrary to Movant's misrepresentation, the German court opinions relied on by Movant *never once* mention "lur[ing] infringers" nor operating a "honeypot."  *See* Pietz Declaration, p. 6; Motion p. 12.  Movant's assertion that "the German court case and the evidence adduced there shows . . . that Guardaley was essentially caught running a so-called 'honeypot'" is plainly wrong.  Motion, p. 12.  There is no support whatsoever for this assertion.

---

[15] Section 4 No. 8 of the German Act Against Unfair Competition provides that "Unfairness shall have occurred in particular where a person . . . (8) asserts or disseminates facts about the goods, services or business of a competitor . . . such facts being suited to harming the operation of the business . . . to the extent that the facts are not demonstrably true . . . ." *See* http://www.wipo.int/wipolex/en/text.jsp?file_id=229699.

I.      Movant's Assertion That "IPP is Simply Guardaley With a New Name" is Wrong

Movant wrongly asserts that "shortly after being tagged by its former lawyers for providing 'unreliable investigative services' and for luring infringers . . . Guardaley set about trying to rebrand."   Pietz Declaration, ¶ 26.   From this conclusory and purely speculative assertion, Movant argues that "IPP itself is nothing more than a shell company designed to hide the fact that the technology supposedly relied upon by plaintiff, and the people behind it, really come from a discredited company called Guardaley."   Motion, pp. 11-2.   Multiple facts prove Movant wrong.   First, Guardaley still exists as a company and still provides its services in Canada and Germany.[16]   Second, even after the Berlin appeals court decision of May 3, 2011, Guardaley continued to provide its services to U.S. companies – concurrently with IPP.   *See e.g. Nu Image, Inc. v. Does 1-3,932*, 2012 WL 1900165, at *7 (M.D. Fla. 2012) *report and recommendation adopted,* 2012 WL 1890829 (M.D. Fla. 2012) ("Further the signed declarations of Benjamin Perino, manager of Guardaley, and Patrick Achache, an employee at Guardaley, state the Plaintiff's research has indicated that the movie has been infringed upon . . . ."); *Nu Image, Inc. v. Does 1-26*, 2:12-cv-04753, (E.D. Pa. August 20, 2012); *Nu Image, Inc. v. Does 1-91*, 4:12-cv-00331 (N.D. Fla. July 9, 2012).   Additionally, on October 17, 2012, subsequent to the opinion cited by Movant, a different German Court, the Regional Court of Appeal of Cologne, found that Guardaley's software operates reliably: (a) "the obvious violation of rights was sufficiently supported by prima facie evidence."   (b) "the appeals court is aware from numerous other proceedings that current expert reports *confirm the proper functioning of the "Observer" software* used by Guardaley here."   (c) "the body of evidence however is sufficient for the requirements of prima facie merits of the facts presented . . . ." (d) "there is also sufficient probable cause that the relevant file is an entire film and not simply a fraction of it."   *See*

---

[16] *See* German company registration, attached hereto as Exhibit M.

Regional Court of Appeal Cologne Decision, Exhibit N (emphasis added).  Importantly, contrary to the Berlin Court's holdings, these findings were made in the context of a BitTorrent copyright infringement lawsuit similar to the one at issue here and *not* an unfair competition claim brought under an unrelated German statute.

J.      The Software Used to Detect the Infringement in This Case Is Not the Same as the Software That Was the Subject of the Decision by the State Court of Berlin

Relying on speculation and hearsay, Movant attempts to draw a straight line from Guardaley to the instant lawsuit.  Indeed, Movant continually conflates Guardaley with IPP in an attempt to cast doubt on the veracity of Plaintiff's evidence in this case.  IPP is not the same company as Guardaley.  The software used to detect and record the infringement that occurred in this case is _not_ the same software that was the subject of the decision by the State Court of Berlin on May 3, 2011, No. 16O55/11 (the "Guardaley Lawsuit") referenced in defense counsel's declaration.  *See* Declaration of Michael Patzer, at ¶ 14.  As such, the issue surrounding Guardaley's software is simply not relevant to the instant lawsuit.

K.      The Declaration of Tobias Fieser is Not False

Arguing that Plaintiff is guilty of "obfuscation," Movant wrongly asserts that "contrary to the sworn assertions Malibu offered in support of its *ex parte* motions for early discovery here, it is not IPP's 'INTERNATIONAL IPTRACKER v. 1.5' software that is being used by Mr. Fieser to collect the data after all . . . but rather new software provided by yet another German company, called Excipio GmbH."  CM/ECF 9, p. 52.  However, the Declaration of Tobias Fieser ("Fieser Declaration") (CM/ECF 4-5) never states that the software belongs to IPP.  "During the performance of my duties, I used forensic software named INTERNATIONAL IPTRACKER v. 1.5 and related technology enabling the scanning of the BitTorrent file distribution network for the presence of infringing transactions involving Plaintiff's movies."  *Id.*, at ¶ 9.  Movant

disingenuously argues semantics by inferring that when Mr. Fieser later states "[o]ur software analyzed each bit downloaded . . . ." he was attempting to claim the software as belonging to IPP. *See* Motion, at n. 32.

"Excipio began licensing its software to IPP in 2011." *See* Declaration of Michael Patzer, at ¶ 13. That IPP is a licensee of the subject software is of no consequence. It does not negate the truth of those fact asserted by Mr. Fieser and is not an attempt at "obfuscation" by Plaintiff.

Movant next attempts to argue that the Fieser Declaration is untruthful as to the tasks performed by Mr. Fieser, suggesting that Michael Patzer should have signed the declaration in support of Plaintiff's Motion for Leave to Take Early Discovery instead of Mr. Fieser. Again, Movant is wrong. Mr. Fieser and Mr. Patzer perform entirely different tasks. As described above, Mr. Fieser has three primary functions at IPP: (1) verify that the BitTorrent computer files as evidenced by their unique hash values are copies of the original works; (2) extract the MySQL server data and make it available to IPP's clients, here Malibu's counsel; and (3) upload a declaration prepared by IPP's clients' counsel (in this case Malibu's attorney) into a computer program and sign a declaration if a green light appears. On the other hand, Mr. Patzer, not Mr. Fieser, restores the PCAPs saved onto the WORM tape drives and makes forensically sound copies of them for use at trial. These roles and functions are entirely different and not at all contradictory.

Significantly, Movant tries to condemn Plaintiff by arguing that it is "attempting to switch horses mid-race," and that "all of a sudden, since January, when IPP's contingency problem was brought to light, Michael Patzer and Excipio are now much more involved in providing evidence to Malibu. Changing the arrangement now does not cure the prejudice."

Motion, p. 54. In making this argument, Movant *purposefully* and egregiously misrepresents facts to this Court. To explain, Movant's argument relies on his Exhibit Z which is Plaintiff's "response to motion to exclude Fieser and IPP filed in Colorado . . . ." Response, p. 52. Movant's counsel admits with regard to Exhibit Z that he "omitted all of the exhibits that consisted of citations to Wikipedia articles *and to portions of Malibu's bellwether trial transcript*." Pietz Declaration, at ¶ 45 (emphasis added). However, the transcript of the Bellwether trial, which took place on June 10, 2013 in the Eastern District of Pennsylvania and was won by Plaintiff, clearly explained both Tobias Fieser's and Michael Patzer's roles with regard to the infringement detection and recording process. Indeed, both Tobias Fieser and Michael Patzer testified in person at trial. Movant's counsel purposefully withheld the transcripts of their testimony from this Court so that he could argue that Plaintiff is now "all of the sudden" changing their process and bringing new information to light. Nothing has changed and no new information has come to light. All of the subject information has been publicly available since June 2013 and Movant's counsel is well aware of this fact. Accordingly, Movant's counsel has purposefully attempted to mislead the Court in asserting a position he knows to be false.

## III.    __ARGUMENT__

### A.    <u>Malibu is Permitted to Pay For Data Collection Services</u>

Malibu has not paid nor offered to pay any individual for testimony. The fee Malibu pays IPP is for data collection services. Paying IPP for data collection services is neither unethical nor prohibited by law. "[P]arties are free to pay individuals, including fact witnesses, for providing information and assisting with litigation, so long as the payment is not for their testimony." *Armenian Assembly of Am., Inc. v. Cafesjian*, 924 F. Supp. 2d 183, 194 (D.D.C.

2013).  "[N]othing in the Code of Professional Responsibility prohibits a contingent fee contract with a consulting service so long as: 1) the service does not engage in the unauthorized practice of law; 2) the lawyer does not share legal fees with the service; and 3) the fee is not payable for the service's testimony."  *Schackow v. Med.-Legal Consulting Serv., Inc.*, 46 Md. App. 179, 196, 416 A.2d 1303, 1313 (1980).

At significant expense, IPP provides Malibu with labor and a data collection service. Malibu Media is permitted to pay IPP for its service.  "[T]his Court is unaware of any authority that interprets Rule 4-3.4(b) as barring counsel from compensating someone for their efforts in collecting evidence."  *Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao Exportacao Ltda*, 2010 WL 625356 (S.D. Fla. 2010).  "[T]he court concludes that [defendant] and its counsel paid [the witness] only for time spent in connection with the litigation process."  *Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 679 (D. Kan. 2000).  "Anyone has a right, when threatened with litigation, or desiring himself to sue, to employ assistance with a view of ascertaining facts as they exist, and to hunt up and procure the presence of witnesses who know of facts and will testify to them."  *Hare v. McGue*, 178 Cal. 740, 742, 174 P. 663, 664 (1918).

B.    No Witness Has Ever Been Paid For Testimony Much Less on a Contingent Basis

Movant erroneously conflates Malibu's proper payment to IPP for its data collection services with the false allegation that Malibu paid Tobias Fieser for testimony.  Mr. Fieser is a salaried non-equity owning employee of IPP.  Fieser, at ¶¶ 4, 7.  Malibu has never paid nor offered to pay Mr. Fieser anything.  *Id.*, at ¶ 11.  When, as here, "[i]t is clear that the [individual] himself, as a witness, is not eligible to receive compensation for his testimony . . . [the] case does not even involve the payment of a fee to a witness."  *People v. McNeill*, 316 Ill. App. 3d 304,

306, 736 N.E.2d 703, 705 (Ill. App. Ct. 2000).   In *McNeil,* the witness's employer's compensation was contingent on the outcome of the case.   Like here, however, the witness was not paid for his testimony.   The *McNeil* Court refused to exclude the witness and opined that the defendant could always attempt to impeach the witness's credibility on the basis that his employer had a contingent interest in the case.

Likewise, in *Schackow v. Med.-Legal Consulting Serv., Inc.*, 46 Md. App. 179, 196, 416 A.2d 1303, 1313 (1980) a company whose compensation was contingent on the outcome of the case arranged for expert witness testimony and helped prepare evidence for trial.   The Maryland Court of Special Appeals found that the witness testimony was proper even with the company's contingency agreement in place because the contingency agreement was sufficiently separate to not influence the testimony.   "It is clear beyond cavil that [Company] purported only to contact medical experts and that no attempt or guarantee was made to 'deliver' expert testimony in exchange for a contingent fee. All the experts were to be paid a flat fee by the client. [Company's] role was limited to locating potential experts and then educating them about the case for [Plaintiff's lawyer]. *That arrangement does not violate the public policy of Maryland.*" *Id.* at 197 (Emphasis added).

C.    The Northern District of Illinois Recently Denied a Motion Nearly Identical to Movant's Motion in a Malibu Media Case

Movant's Motion raises the exact same issues that were recently addressed by the Honorable Judge Ellis in *Malibu Media, LLC v. Doe*, 13 C 8484, 2014 WL 1228383 (N.D. Ill. Mar. 24, 2014).

> Doe contends that Malibu Media should have notified the Court of the following: (1) that its investigator, IPP, was being compensated pursuant to a contingency fee arrangement and is not a licensed private detective in Illinois; (2) that IPP is hiding its actual name and connection with another company, Guardaley, from the Court, Doe, and other defendants Malibu Media has sued; (3) that Fieser does not

actually monitor the BitTorrent network as represented in his declaration and that instead a different individual, Michael Patzer, performs that task; and (4) whether Malibu Media had a *prima facie* case of copyright infringement.

*Malibu Media, LLC v. Doe*, 13 C 8484, 2014 WL 1228383 (N.D. Ill. Mar. 24, 2014).

Addressing each argument the court concluded: "The Court is not convinced that the fact that Malibu Media pays IPP for its services would have changed the decision to grant the subpoena. Thus, Malibu Media's failure to apprise the Court of this fact does not warrant quashing the subpoena." *Id.*

> Doe's other three arguments relate to what Doe considers to be illegality and obfuscation surrounding Malibu Media's investigative methods. Doe maintains that because of these problems, the Court should not have considered Fieser's declaration. In response to Doe's motion, Malibu Media provides declarations that IPP is paid only for data collection services, that IPP has not been compensated for any work related to this specific case, and that Malibu Media has never paid nor offered to pay Fieser anything for his testimony. But even if Fieser or IPP were compensated on a contingency basis or otherwise for testimony, in violation of the rules of professional conduct applicable in this Court or 18 U.S.C. § 201(c)(2), which prohibits paying fact witnesses for their testimony, this does not make evidence obtained in violation of those rules inadmissible but rather only goes to the weight to be accorded to it.

*Id.*

> D.   Even if Malibu Had Paid a Witness on a Contingency That Witness's Testimony Should Not be Excluded

"The *per se* exclusion of whole categories of evidence is disfavored by the Federal Rules of Evidence.   It is a fundamental tenet of those rules that, with few exceptions, 'all relevant evidence is admissible,' Fed. R. Evid. 402, and 'every person is competent to be a witness,' Fed. R. Evid. 601." *U.S. v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987) (refusing to prevent the federal government's confidential informant from testifying even though the federal government had offered the confidential informant *contingent* compensation for his testimony.) "[T]he credibility of both paid informers and witnesses who are promised a reduced sentence for their cooperation should be a matter for the jury to evaluate."   *United States v. Holloman*, 238

F.3d 416 (4th Cir. 2000).  "[E]ven though compensation for testimony can be troubling, it does not follow that the use of such an arrangement renders such testimony constitutionally inadmissible *per se.*"  *United States v. Levenite*, 277 F.3d 454, 461 (4th Cir. 2002).  Notably absent from Fed. R. Evid. 402 and 601 is that a witness be disinterested or uncompensated in order to be permitted to testify.

Consistent with the foregoing the "assumption that interested witnesses necessarily lie or that disqualification is the best way to deal with the threat of perjury" has been rejected. 27 Charles A. Wright & Victor J. Gold, *Federal Practice & Procedure* § 6005, at 69 (2007).  Even if a witness had motivation to lie "it does not follow that his testimony was untrue, nor does it follow that his testimony was constitutionally inadmissible. The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury."  *Hoffa v. United States*, 385 U.S. 293, 311, 87 S. Ct. 408, 418, 17 L. Ed. 2d 374 (1966).  "[T]he potential unreliability of a type of evidence does not alone render its introduction at the defendant's trial fundamentally unfair."  *Perry v. New Hampshire*, 132 S. Ct. 716, 728, 181 L. Ed. 2d 694 (2012).

Here, there has been no bad faith by Plaintiff or Plaintiff's counsel.  Movant's motion relies on incidents that happened outside this case.  The software at issue in the Guardaley case is not the same software here.  *See* Declaration of Michael Patzer, at ¶ 14.  A monthly fixed fee agreement, not an oral contingency agreement, was in place when this case was filed.  *See* Declaration of Colette Field, at ¶ 8.  Mr. Fieser has not been paid anything for his testimony in this case.  *See* Declaration of Tobias Fieser, at ¶ 7-10.  And, Mr. Fieser's testimony is independently verifiable.  *See* Declaration of Michael Patzer, at ¶ 15.  Finally, even if Plaintiff's agreement with IPP was improper, *which it is not*, it does not violate Maryland Rule of

Professional Conduct 3.4(b) because undersigned did not negotiate the agreement and IPP has not been paid anything for this case.  And, if Movant seeks to discredit IPP's software, subject to a protective order that will protect the software's trade secrets, he is free to test it.

E.      Malibu Did Not Violate the Federal Anti-Gratuity Statute But Even if it Had That Would Not Be a Basis For Excluding Evidence or Testimony

Movant's assertion that Malibu violated 18 U.S.C. § 201(c)(2) – which prohibits knowingly paying a person to testify – is  baseless.  First, Plaintiff has an agreement to pay IPP for its data collection efforts.  It does not pay Mr. Fieser nor does it pay IPP for Mr. Fieser's testimony.  *Centennial Mgmt. Servs., Inc. v. Axa Re Vie*, 193 F.R.D. 671, 681 (D. Kan. 2000) ("the court has concluded, based on the evidence before it, that neither [defendant] nor its counsel paid money to [witness] 'for' or 'because of' his testimony. Accordingly, the court must conclude that no violation of section 201(c)(2) occurred."   Second, Mr. Fieser's testimony is truthful.  Therefore, 18 U.S.C. § 201(c)(2) does not apply.  *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516, 1524 (S.D. Fla. 1994) ("Because there is no evidence in the record that the testimony elicited through [Defendant's] monetary inducements was false testimony, the Court concludes that the evidence does not support a violation of § 201(c)(2).")

Third, and most significantly here, 18 U.S.C. § 201 is a criminal statute *not* an evidentiary rule of exclusion.  Indeed, even if testimony is proffered which violates 18 U.S.C. § 201(c)(2) the testimony should not be excluded under Fed. R. Evid. 403 or any other rule because "exclusion confers windfalls on the guilty," and "a jury should be competent to discount appropriately testimony given under a powerful inducement to lie." *United States v. Dawson*, 425 F.3d 389, 394 (7th Cir. 2005).

F.      Malibu's Motion for Leave Did Not Violate Maryland Rule of Professional Conduct 3.3(d)

Movant erroneously argues that undersigned violated the Maryland Rules of Professional Conduct because "the Court *might* have excluded or, at the very least, looked more skeptically at the Fieser declaration if the Court knew it was coming from a contingent fee witness." *See* CM/ECF 9 at *41 (Emphasis in the original).

"The object of an ex parte proceeding is [] to yield a substantially just result."  MD R CTS J AND ATTYS Rule 16-812, MRPC 3.3.  This is accomplished by an attorney's duty to "make disclosures of material facts known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision."  *Id.*  Here, the Court's only decision with regard to Plaintiff's *ex parte* motion, was limited to whether or not Plaintiff had demonstrated that "good cause" existed for it to serve early discovery on Movant's ISP to uncover Movant's identity.

The good cause standard examines: (1) whether the plaintiff made a prima facie showing of a claim of copyright infringement, (2) whether the plaintiff submitted a specific discovery request, (3) whether there is an absence of alternative means to obtain the subpoenaed information, (4) whether there is a central need for the subpoenaed information, and (5) the defendant's expectation of privacy.  *See* CM/ECF 4-1, at p. 4.  Significantly, this Court found that Plaintiff satisfied the above factors by granting its motion.  *See* CM/ECF 6, at p. 4.  Further, the Court considered that the Doe Defendant may not be the infringer and set forth significant procedural safe guards to protect the Doe Defendant.  *See Id*. at *3.

The weight and credibility of the evidence that Plaintiff may use to prove its case is not relevant to the good cause standard.  To the contrary, this Court and numerous others have previously examined many similar motions by this Plaintiff and none has ever found it necessary

or appropriate to examine the evidence or its credibility prior to allowing early discovery.[17]

Regardless, as explained herein, Plaintiff's evidence is sound and immune to bias because of the

numerous steps and safeguards involved.    "Malibu Media specifically set forth in its

memorandum in support of its motion for leave to serve the third party subpoena that it has a

*prima facie* claim for copyright infringement. And although Doe argues that Malibu Media

should have informed the Court of how much of each file Doe had downloaded or shared, the

specificity Doe requests is not required at the pleading stage."  *Malibu Media, LLC v. Doe*, 13 C

8484, 2014 WL 1228383 (N.D. Ill. Mar. 24, 2014).

        G.     The Cases Which Movant Relies on Are Distinguishable

            *1.  The Accrued Cases Are Not On Point*

        Each of the cases relied upon by Movant is distinguishable from the case at hand.  First,

neither the Fourth Circuit, nor the District Court of Maryland decision in *Accrued Financial*

stood for the proposition that evidence should be excluded in a contingency case.    Indeed, the

premise upon which Judge Motz based his order dismissing the case in *Accrued Financial* was

that, "the assignments made by the tenants to AFS are void as a matter of public policy because

they are champertous."  *Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, CIV.JFM-99-2573, 2000

WL 976800 (D. Md. June 19, 2000) *aff'd*, 298 F.3d 291 (4th Cir. 2002).  "The two appeals now

before us are concurrent, raising the same issue—whether the contractual arrangements between

---

[17] In a similar BitTorrent copyright infringement case brought by this Plaintiff in the Western District of Michigan a defendant attempted to assert a similar argument under Michigan Rule of Professional Conduct 3.3(d), which is identical to the Maryland Rule.  There the defendant included three pages of "disclosures" which he believed Plaintiff should have disclosed to the court in its ex parte motion for early discovery.  Similar to here, many of the "disclosures" related to Plaintiff's evidence and ability to prove its case.  Rejecting the defendant's argument, the court held that it was "unconvinced that omission of those statements violated Rule 3.3(d).   The Court has previously scrutinized Plaintiff's subpoena request and determined that Plaintiff has established 'good cause' . . . with 'good cause' shown, such a process is necessary for a copyright holder to protect its copyright when BitTorrent protocol is the alleged method of infringement."  *Malibu Media, LLC v. Doe*, 1:13-cv-00893-RJJ, CM/ECF 15, at p. 2 (W.D. Mich. October 28, 2013).

AFS and the tenants are void as against the public policy of Maryland." *Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291, 296 (4th Cir. 2002). The question at issue in the *Accrued* cases was whether the agreement between the parties was void, thereby eliminating standing on behalf of the plaintiff. Here, Malibu Media is the real party in interest and has standing to sue because it owns the copyrights which have been infringed.

Movant attempts to equate paying IPP for its data collection services as a "champertous" agreement. This argument is, at best, meritless.

> Champerty,' a form of maintenance, occurs when a stranger makes 'a bargain with a plaintiff or defendant to divide the land or other matter sued for between them if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense.' Champerty and maintenance will not be found 'unless the interference is clearly officious and for the purpose of stirring up 'strife and continuing litigation.

*Am. Hotel Mgmt. Associates, Inc. v. Jones*, 768 F.2d 562, 570-71 (4th Cir. 1985).

IPP is not a stranger to the dispute and does not seek to benefit from the outcome of this litigation. Malibu Media hired IPP for its specific purpose, to accurately record the IP addresses which infringe its property. As set forth above, courts consistently permit litigants to pay others for their support services during the litigation process.

In *Accrued*, the Fourth Circuit noted that "[t]he laws against champerty, maintenance and barratry are aimed at the prevention of multitudinous and useless lawsuits." *Accrued Fin. Servs., Inc. v. Prime Retail, Inc.,* 298 F.3d 291, 306 (4th Cir. 2002). Significantly, the Fourth Circuit found the agreement with Accrued to be void against public policy because the claims were brought with no regard to the real party in interest.

> Under these arrangements, even though the tenant might conclude, after reviewing the facts uncovered, that a lawsuit would imprudently damage the landlord-tenant relationship—or that pursuing aggressive allegations would do more harm than good—the tenant lost the right to control its destiny. Because we see these broad assignments as nothing more than arrangements through which to

27

intermeddle and stir up litigation for the purpose of making a profit, we conclude that they violate Maryland's strong public policy against stirring up litigation and are therefore void and unenforceable in Maryland.

*Id.* at 298.

The factors at issue in *Accrued* are not present in this case. Malibu Media files suits to protect its business and it is in control of each lawsuit. Its litigation is not frivolous. And, Malibu Media sought IPP's aid in identifying the infringing IP addresses, not the other way around. Malibu Media sought IPP's services because "the most significant competitive threat to the business of X-Art.com is on-line piracy, and BitTorrent. The website can only compete in a fair marketplace, and cannot compete against free versions of its works." Exhibit G, Field Declaration at ¶ 5.

Attached as an exhibit to its Motion for Leave to take early discovery, Plaintiff explains its purpose for filing this lawsuit. "We spend over two million dollars a year producing content, and millions more each year to run our business." CM/ECF 4-2 at ¶ 14. "Currently we have tens of thousands of members, but we are finding it hard to grow and maintain the memberships as so many people are findings our films for free." *Id*. at ¶ 15. "Each month, approximately 80,000 US residents use BitTorrent to steal our movies." *Id*. at ¶ 16. "We have worked hard and invested millions of dollars in our business in order to produce the best quality product." *Id*. at ¶ 17. "For the first 3 years (when our site was not as popular) we didn't have as many issues with piracy. Now, that our videos are highly desirable, more people steal our videos than pay for a subscription." *Id*. at ¶ 18. "We are even getting many complaints from our members (asking why they should pay when they are available for free on the torrents)." *Id*. at ¶19. "We must protect our copyrights in order to survive and to hope for any growth." *Id*. at ¶ 21. "Without these suits, I believe infringers would feel free to steal our movies without consequence." *Id*. at ¶ 32. "In conclusion, we want the courts to know that we are a small business and we need the law

to be enforced to ensure our survival.  It is getting more difficult for us every day and we hope that in the future there will be a better way to protect our copyrights." *Id.* at ¶ 33.

Malibu Media, the injured party, is consciously bringing this lawsuit because it has no other way to stop the infringement of its movies and protect its business.  As the Field declaration states, "*We* do not pursue our claims against all Doe Defendants." *Id.* at ¶ 26. "*Malibu Media engaged* IPP International UG ("IPP") to detect infringement of its copyright works." Field Dec. at ¶ 6.  This case does not involve champerty.

### 2. *Farmer v. Ramsey Is Not On Point*

Movant's reliance on *Farmer v. Ramsay*, 159 F. Supp. 2d 873, 883 (D. Md. 2001) is misplaced.  In *Farmer,* the Court excluded the expert's subjective and questionable witness report on the basis that the report appeared influenced by the direct contingency fee arrangement. The Court noted that the data in the expert's report actually conflicted with the expert's conclusion. *Id.* at *881.  And, also found that "[e]ven if the reports were admitted, however, they would add little, if any, weight to Farmer's case." *Id.* at 883-84.  This was because, "the Fourth Circuit has repeatedly held that 'raw statistics devoid of any context which relates those statistics to the alleged discriminatory practice are of minimal probative value.'" *Id.* at 884.

Here, there is no contingency fee agreement present in this action, Mr. Fieser has not been paid anything at all, and his report is not subjective. Indeed, Movant is welcome to examine the PCAPs containing the evidence of infringement from his IP address.  Even if Mr. Fieser's report were to be excluded, the evidence supporting the report is still probative of the infringement that occurred through Movant's IP address.  There is simply no basis to exclude that evidence, particularly when Mr. Patzer has independently verified that the evidence is correct.  Patzer Dec at ¶ 15.

Movant even implicitly acknowledges that the evidence upon which Mr. Fieser bases his report is valid. *See* CM/ECF 9 at *54 ("Malibu can start over filing new cases, provided that they *accurately* disclose the nature of the Excipio software that is really being used.")  Indeed, at no point in Movant's brief does he suggest that the evidence of infringement is wrong or incorrect.  Instead, he finds the act itself of signing the declaration to be in incorrect.  Requesting the Court exclude this evidence and dismiss Plaintiff's case is not supported by the case law he relies on.

H.   Plaintiff Was Not Forum Shopping When It Dismissed Its Case

Plaintiff was not forum shopping when it dismissed its case in *Malibu Media v. John Doe*, 8:13-cv-03024-JFM, (D. Md.).  Movant's assertion to the contrary is outrageous, insulting, and based on pure speculation.  As set forth above, Plaintiff has done nothing wrong and has nothing to hide.  And, Plaintiff had the absolute right to dismiss its case because Movant had not filed an answer or moved for summary judgment.  *See Gorrell v. Huffman,* 5:11CV44, 2011 WL 2065292 (N.D.W. Va. May 25, 2011) ("In federal civil suits, the plaintiff has an absolute right to dismiss without prejudice up until the defendant answers the complaint or moves for summary judgment.")

As Plaintiff explained to Movant's counsel in that case, Plaintiff's investigation had revealed that the subscriber of the IP address lived with several roommates.  *See* CM/ECF 10 - Exhibit X.  From Plaintiff's experience, a deposition where an individual can point the finger at others, is not often fruitful.  Further, the Rule 4(m) deadline had already expired.  At that stage in the litigation, Movant's counsel wanted Plaintiff to spend extensive time and expense gathering declarations and explaining itself (as it has done here) in order to, maybe, depose his client.

Knowing that the deposition would not likely be fruitful, Plaintiff chose to dismiss its case, rather than attempt to appease Movant's counsel.  This does not amount to forum shopping.

Movant's argument that Plaintiff dismissed its case after reviewing a similar paper filing in the District Court of Colorado is nonsensical.  Plaintiff's response in that case actually caused the defense counsel to withdraw his motion.  *See Malibu Media v. Jeremiah Benson*, 13-cv-02395 (D. Colo) Exhibit O.  Likewise, another opposing counsel who filed a similar motion also withdrew it after reviewing Plaintiff's response.  *See Malibu Media v. Kelley Tashiro*, 13-cv-00205 (S.D. In.) Exhibit P ("[T]here is no need to waste Tashiro's resources, or the resources of this Court, barring testimony that Malibu has stated will not be put on by IPP or its representatives.").  If anything, Plaintiff would have expected Movant's counsel to have done the same in the Judge Motz case, but not until after Plaintiff incurred significant expense and delay.

I.      Sanctioning Plaintiff By Dismissing Its Cases Is Improper And Unwarranted

Relying on *United States v. Shaffer Equip. Co.*, 11 F.3d 450 (4th Cir. 1993), Movant argues that "the context of the litigation favors not just preclusion of evidence from IPP and Fieser, but outright dismissal of the case."  Motion, p. 38.  *Shaffer* recognized however that sanctioning a party by dismissing a case is only appropriate in the most severe scenarios.  "Because the [court's] inherent power is not regulated by Congress or the people and is particularly subject to abuse, it must be exercised with the *greatest restraint and caution*, and then only to the extent necessary . . . Since orders dismissing actions are *the most severe*, such orders must be entered *with the greatest caution*."  *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993) (emphasis added).  The Court held that six factors *must* be considered prior to dismissing a case under the court's inherent power to sanction:

> (1) the degree of the wrongdoer's culpability; (2) the extent of the client's blameworthiness if the wrongful conduct is committed by its attorney,

recognizing that we seldom dismiss claims against blameless clients; (3) the prejudice to the judicial process and the administration of justice; (4) the prejudice to the victim; (5) the availability of other sanctions to rectify the wrong by punishing culpable persons, compensating harmed persons, and deterring similar conduct in the future; and (6) the public interest.

*Id.* at 462-63.

In *Shaffer* the EPA brought an action under CERCLA and "the district court found that the government's attorneys deliberately and in bad faith breached their duty of candor owed to the court during the course of proceedings." *Id.* at 452. Specifically, "the EPA's on-scene coordinator for the cleanup, had misrepresented his academic achievements and credentials in this and in other cases and . . . the government's attorneys wrongfully obstructed the defendants' efforts to root out the discrepancies and failed to reveal them once they learned of them." *Id.* Despite the seriousness of the factual findings made by the district court, the Fourth Circuit reversed the dismissal of the case "[m]indful of the strong policy that cases be decided on the merits, and that dismissal without deciding the merits is *the most extreme sanction*." *Id.* at 462 (emphasis added). The Fourth Circuit also "observe[d] that through an outright dismissal, the defendants receive the benefit of a total release from their obligations under the . . . laws. This would provide the defendants relief far beyond the harm caused by . . . [any] improper conduct and would frustrate the resolution on the merits . . . ." *Id.* at 463.

Here, no witness has been paid on a contingency basis as alleged by Movant and therefore no wrong has occurred. Further, the previous "oral contingency" arrangement has since been replaced. The purportedly "tainted" evidence is verifiable by anyone and, indeed, the evidence has been independently verified by Michael Patzer thereby eliminating the issue as it pertains to Tobias Fieser and IPP. Accordingly, neither Plaintiff nor its counsel is culpable. Further, neither Movant nor the Court has suffered any prejudice. Movant attempts to argue that

Plaintiff's "obfuscation of the links between IPP and Guardaley and their apparent financial interest in this litigation has . . . prejudiced the ability of movant and similarly situated defendants to seek appropriate discovery."   Motion, p. 43.   Movant's broad allegation of prejudice is simply not true.   Movant has not yet attempted to "seek appropriate discovery" in this case and therefore, this argument cannot be maintained in good faith.   Additionally, other lesser sanctions are available to rectify any purported wrongdoing.   Dismissal of multiple complaints is not appropriate relief for Movant's motion which is essentially a motion *in limine* to exclude evidence.   Indeed, Movant's only argument to the contrary is that because of the number of lawsuits Plaintiff has filed nationwide, "dismissal of one or even a few dozen suits is no catastrophe for the plaintiff."   Motion, p. 48.   This is not a reason to impose the most severe sanction and Movant fails to cite even a single case finding that dismissal was warranted based on similar circumstances.   Instead, Movant's Motions were filed in order to attempt to "receive the benefit of a total release from their obligations under the . . . laws . . ." in an attempt to escape liability for the infringement alleged.   *Id.* at 463.   This Court should not abide Movant's attempts.

Finally, Movant tries to argue that the public interest factor weighs in his or her favor because "On Balance, These Lawsuits Are Against the Public Interest."   Motion, p. 44.   In support, Movant argues that the potential for large statutory damage awards and the potential embarrassment of being named as a defendant in one of Plaintiff's lawsuits weighs against the public interest.   *See* Motion, p. 46.   However, Plaintiff is entitled to pursue its claims against infringers and seek relief in accordance with the statutory provisions of the Copyright Act for the pervasive infringement it suffers on a daily basis.   To hold otherwise would abrogate Plaintiff's rights under the Copyright Act.   Movant's argument in support of the sixth and final factor rings hollow.

Even if the Court finds that some wrongdoing has occurred, "the orderly administration of justice and the integrity of the process have not been permanently frustrated[.]"  *Shaffer* at 463.  In cases involving more egregious conduct than that argued by Movant here, courts have repeatedly denied sanctioning a party by dismissal or default judgment, saving the harshest of sanctions for only the worst conduct.  *See e.g. United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993) (despite violations of duty of candor and Fed. R. Civ. P. 26 involving obstruction of efforts to discover factual information, failure to withdraw objections to interrogatories, failure to modify a position wrongfully taken at a deposition, failure to advise the court or opposing counsel of subsequently discovered information, and improperly continuing litigation without disclosing existence of ongoing related criminal investigations, the Fourth Circuit found that dismissal as sanction was too severe); *Glynn v. EDO Corp.*, 2010 WL 3294347 (D. Md. Aug. 20, 2010) (dismissal improper where party wrongfully obtained internal documents and asserted privilege in bad faith, noting "even where a party steals property or information, dismissal or default judgment is only warranted in extreme circumstances.").

As the foregoing cases make clear, dismissal as a sanction is only appropriate in the most heinous situations.  The conduct alleged by Movant in this case does not compare to the blatantly offensive conduct described above which was clearly ripe for dismissal.  Accordingly, this Court should deny Movant's overreaching request for relief.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons Plaintiff respectfully requests the Court deny the Movant's motion.

Dated:  April 28, 2014

Respectfully submitted,

MALIBU MEDIA, LLC.
PLAINTIFF

By:  /s/*Jon A. Hoppe*
Jon A. Hoppe, Esquire #6479
Counsel
Maddox, Hoppe, Hoofnagle &
      Hafey, L.L.C.
1401 Mercantile Lane #105
Largo, Maryland 20774
(301) 341-2580

## CERTIFICATE OF SERVICE

     I hereby certify that on April 28, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system.

By:  /s/*Jon A. Hoppe*